UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GARY McGUIRE, a Named Fiduciary, on
behalf of THE UNION CARBIDE
EMPLOYEES' PENSION PLAN,

    Plaintiff,

                        Case No. 12-10797

v.

                        Honorable Thomas L. Ludington

METROPOLITAN LIFE INSURANCE
COMPANY,

    Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND
## DISMISSING COUNT IV WITH PREJUDICE

In 1937 and 1951 — long before the passage of the Employee Retirement Income Security Act of 1974 ("ERISA") — Union Carbide Corporation ("UCC") contracted with Defendant Metropolitan Life Insurance Company and Prudential Insurance Company of America ("Prudential") to provide annuities to UCC employees. Those 1937 and 1951 agreements (the "Contracts") are administered by the Union Carbide Employees' Pension Plan (the "Plan").

Plaintiff Gary McGuire, a named fiduciary of the UCC Employees Pension Plan, commenced this case seeking to enforce the Contracts and contending that Defendant's duties later became subject to a fiduciary obligation to the Plan under ERISA. Defendant filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), primarily challenging the plausibility of Plaintiff's claims. Defendant disputes Planitiff's interpretation of the language of the Contracts as well as the applicability of ERISA to the contractual relationship.

Analysis of Defendant's motion to dismiss, it should be noted, is complicated by the fact that

Plaintiff's complaint does not identify the provisions of the contracts that he is relying upon for his factual assertions.  Further, the copies of the Contracts furnished by the Defendant are partially illegible.

Nevertheless, for purposes of analysis, the facts are those alleged in Plaintiff's complaint, accepted as true, together with the text of the relevant documents furnished by Defendant. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (directing the court, in the context of a motion to dismiss, to construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face.").

## Plaintiff's Allegations

The Plan provides retirement benefits to nearly 50,000 UCC employees and retirees.  In exchange for the payment of premiums, Defendant and Prudential guaranteed annuity payments to UCC employees. Prudential took the principal role as administrator, as required by the Contracts, but the insurance companies shared the premiums evenly, and each company made half of the benefits payments to UCC employees. The Plan paid the insurance companies from a Plan bank account.

The Contracts at issue are Group Annuity Contract No. GA-142-J ("GAC 142-J") and Group Annuity Contract No. GA-314-J ("GAC 314-J"). They were issued in 1937 and 1951, respectively, by Defendant and Prudential to UCC, then known as Union Carbide and Carbon Corporation. Both Contracts provide for the payment of premiums by UCC in exchange for the payment of lifetime annuity benefits to certain participants in the Plan and their beneficiaries.

GAC 142-J provides that during its Active Term — the period from the Effective Date of

the Contract until the termination of the Contract or the commencement of the Paid-Up Term, whichever is earlier — "this Contract is a participating Contract, and the Insurance Companies will, during such Active Term, annually ascertain and apportion as a dividend to this Contract its share of any divisible surplus accruing under contracts of this class." ECF No. 9 Ex. A-1 at 22. It further provides that "in determining the portion, if any, of the divisible surplus accruing under this Contract, each of the Insurance Companies will take into consideration for calendar years after 1972 its experience under Group Annuity Contract No. GA-314-J issued by the Insurance Companies to the Employer." *Id.* Any dividends are payable to UCC, or at its direction, to an insurance company, employee benefit plan, or the trustee of such a plan that provides benefits for UCC employees. *Id.* Nothing in the Contract requires any dividends to be used to pay additional benefits for beneficiaries of the Plan.

GAC 314-J contains almost identical language. GAC 314-J provides that "[e]ach Insurance Company will annually ascertain and apportion as a dividend to this Contract its share of any divisible surplus of such insurance Company accruing under contracts of this class." ECF No. 9 Ex. A-2 at 6a, 4g (referring to "the determination of the financial experience under its Group Annuity Contracts generally for purposes of ascertaining the amount of any divisible surplus payable to Group Annuity Contracts, to the end that uniform and consistent treatment will be accorded to this Contract").  Any such dividends are to be paid to UCC or its designee as follows:

> any dividends or other amounts which would otherwise be credited to the Contract-Holder shall be applied in whole or in part toward the payment of any contribution under a contract issued by an insurance company and providing benefits for employees of the Contract-Holder, as designated by the Contract-Holder in a written notice to the Insurance Companies, or, if the Contract-Holder so designates, such amount shall be paid to a trustee or trustees under an employees' benefit plan and designated by the Contract-Holder in such request, or such amount shall be distributed in such proportion as the Contract-Holder shall determine among (i) any

such trustee or trustees and (ii) any such contracts.

*Id.* at Amendment to GAC 314-J, effective January 1, 1973, at ¶ 3(e). The Contract-Holder under GAC 314-J is UCC. *Id.* at Special Provision F, page 13c ("Effective January 1, 1966, Union Carbide Corporation is designated as successor Contract-Holder hereunder.").)

According to Plaintiff, the Contracts did not provide for just an annuity insurance product to be provided in exchange for a fixed premium. Rather, UCC, as the plan sponsor, bargained for an annuity product, and also for the investment of a certain amount of the premium payments in the insurance companies' general accounts. The investment assets, it was believed, would appreciate. Under the Contracts, the insurance companies agreed to distribute the investment gains to the Plan through dividend payments. The Contracts did not guarantee investment results. Instead, they required the insurance companies to consider the investment experience of each Contract and the expense necessary to pay promised annuity benefits to Plan participants, and then to determine the amount to pay the Plan. At the termination of the Contracts, any remaining accumulated investment gain which had not been paid as a dividend (referred to in the complaint as the "fund balances"), were to be paid to the Plan. The Plan has used the dividends it has recieved to provide other benefits to Plan participants and to provide for the administration of the Plan.

In 1973, UCC and insurance company representatives amended the Contracts to alter the calculation of dividends. This change required Defendant and Prudential to calculate dividends based on the pooled investment experience of GAC 142-J and GAC 314-J, taken together as a "class of contracts." Like the original policies, the 1973 dividend policy does not guarantee minimum dividend payments to the Plan, and Defendant and Prudential have paid different amounts over the years based on the 1973 dividend policy.

-4-

In 1974, Congress enacted ERISA to address mismanagement of pension plan assets. Later, the Department of Labor (the "DOL") promulgated regulations for pension plans and those who manage pension funds. The Plan began annual internal audits. Then, in 1994, the Supreme Court of the United States decided *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, 510 U.S. 86 (1993). The Court concluded that, under certain circumstances, when a plan owns a contract that is supported by an insurance company's general account, an undivided portion of each asset held in the general account constitutes an asset of the plan.  The Court concluded that ERISA imposes a fiduciary duty on the insurance companies responsible for the assets in its general account. *See id.* at 106. Plaintiff believes that the Contracts were the type of contract that *Hancock* addressed; namely, the type of contract providing that decisions and actions of the insurance company affect the value of the contract held by the Plan.

In March of 1998, Defendant sent a letter to the Plan (the "Dividend Letter") explaining that "because of steadily improving mortality over the years it is unlikely that future dividends will be declared on the class of business to which this contract belongs." The Dividend Letter was sent by Louis A. Qualia on letterhead that identifies him as "Director Client Relations" for Defendant's "Pensions National Accounts." ECF No. 9 Ex. A-3. The Dividend Letter explained that, due to increased life expectancies and low interest rates, future dividends were unlikely because investment income was unlikely to offset mortality losses. *See id.* Defendant's Dividend Letter noted that "if future experience is significantly more favorable than we expect, future dividends may be declared." *Id.*; Compl. ¶ 41. The Plan alleges that it did not believe it had reason to question Defendant's actuarial analysis. Further, the Plan understood that after all obligations under the Contracts were satisfied, fund balances held by Defendant would revert to the Plan. In 1998, Defendant reported

-5-

fund balances of approximately $11 million to the Plan.

From 1998 to 2008, Defendant did not make any dividend payments to the Plan, but continued to report fund balances as Plan assets on periodic financial statements. Compl. ¶ 38. Performing its statutory ERISA obligations, the Plan reviewed Defendant's statements in connection with the yearly internal audit procedure, commissioned independent examination of the Plan's financials, and obtained certifications from Prudential and the Plan's trustee regarding the accuracy of financial information. Based on the financial statements, the Plan prepared annual Form 5500 reports about the Plan's assets for the DOL, which were also available to Plan participants. Compl. ¶¶ 68, 69.

In 2008, the Plan began a special investigation of the Plan's investments and funding sources to assess the Plan's stability in light of the credit crisis. The Plan contacted all of its financial managers to verify the types of Plan investments. Prudential responded to the Plan's inquiries as the principal administrator of the Contracts, but directed the Plan to Defendant for information about its investments. Plaintiff alleges that Defendant did not provide timely responses to the Plan's requests for information and made several inconsistent statements. When the time came to file the Plan's Form 5500 in 2009, Defendant withheld information it had been providing in previous years. Defendant also represented for the first time that it had no further obligations under the Contracts with respect to dividend payments or the eventual return of the Contracts' fund balances.

As a result, the Plan began a two-year investigation into Defendant's accounting for dividends and fund balances due under the Contracts. Eventually, the Plan asked the New York State Insurance Department (the "NYSID") to help gather information from Defendant. In response to the NYSID's inquiries, Defendant wrote the Plan in December 2009, acknowledged that it owed $11.6

million dollars to the Plan, and proposed repayment. Defendant later purported to revoke this acknowledgment because of an alleged "computational error." Compl. ¶¶ 85-87.

In February 2010, the NYSID forwarded the Plan an email Defendant's representative had sent explaining the cessation of dividends. In this email, Defendant explained that "effective with calendar years beginning after 1997, [Defendant] changed its dividend policy for its group deferred annuity block of business. . . . The rationale for the stoppage of dividends was that, in aggregate, the block was experiencing negative divisible surplus, a condition which is worsened by the payment of dividends to contracts with positive surplus." Compl. ¶ 45. Despite the Plan's repeated inquiries and the accompanying investigation, Defendant had never before disclosed the dividend policy change.

In March 2010, following the Defendant's email to the NYSID, Defendant and UCC entered into a statute of limitations tolling agreement that related back to October 19, 2009. The tolling agreement ended on January 26, 2012. Plaintiff filed this lawsuit shortly thereafter. Compl. ¶¶ 44-46, 89. The Complaint asserts breach of fiduciary duty claims for entering into prohibited transactions under ERISA §§ 406(a); 406(b) (Count I), and § 404 (Count II); for restitution and unjust enrichment under federal common law (Count III); for equitable estoppel under federal common law and ERISA § 413 (Count IV); and for declaratory judgment under ERISA § 502(a)(3) (Count V). These claims are based on Defendant's alleged failure to pay dividends owed to the Plan and Defendant's alleged repudiation of its obligation to pay the Plan "fund balances" when the Contracts terminate. In lieu of filing an answer, Defendant filed a motion to dismiss Plaintiff's complaint.

**Defendant's Motion to Dismiss**

Defendant contends in its motion that the Complaint mischaracterizes the provisions of the

Contracts. While Plaintiff's complaint purports to describe the Contracts, Defendant contends that the complaint avoids addressing the text of the Contracts.  Contrary to Plaintiff's allegations, Defendant asserts the Contracts do not require that dividends be paid annually based on the individual experience of each Contract, do not require that a particular methodology be used in calculating divisible surplus or apportioning dividends, do not prohibit changes in the methodology or formula used in determining dividends, and do not provide for payment of a residual "fund balance" attributable to the Contracts after all benefits guaranteed by the Contracts have been paid.

Defendant challenges the Plan's assertion that it has a fiduciary obligation to the plan with additional obligations beyond those imposed by contract law.  Defendant explains that it has no obligation to declare dividends under the Contracts, or to pay "fund balances" at their termination, because the Contracts do not address such a contingency. Defendant argues that Plaintiff's unwarranted efforts to use ERISA to expand its contractual obligations should be rejected.

Defendant also challenges Plaintiff's standing to bring the claim on behalf of the Plan because any rights with respect to dividends belong to UCC, not the Plan. Moreover, Defendant contends the dividend-related claims are untimely under the six-year statute of limitations that applies to those claims as Plaintiff waited until 2012 to bring claims based on events that occurred in 1998.

Defendant next challenges the timeliness of Plaintiff's claims, asserting that Plaintiff did not investigate what the Plan now characterizes as anomalies until 2009—eleven years after the alleged change in dividend policy took effect. Plaintiff alleges that Plan representatives finally requested information from Defendant in 2009, deemed Defendant's answers unsatisfactory, and then "eventually" requested assistance by the New York State Department of Insurance. *Id.* ¶¶ 44, 66.

After failing to persuade the regulator that Defendant had done anything improper, Plaintiff filed a complaint with this Court in 2012.

Finally, Defendant also challenges Plaintiff's factual assertion that "[t]he Plan is also entitled to any fund balances remaining when the Contracts terminate." *Id. ¶ 24*; *see also* ¶¶ 4, 11, 14, 34, 43. Plaintiff defines "fund balances" as "the remaining divisible surplus" "[w]hen the Contracts terminate." Defendant contends that the language of the Contracts do not support these allegations. Although GAC 142-J contains approximately seventy pages of substantive terms and provisions, no provision provides for the return of any "fund balance" or divisible surplus when the Contract terminates. GAC 314-J does address certain payments that must be made at the termination of the Contracts under certain circumstances, but does not provide for the return of "remaining divisible surplus" to the Plan. The only payment that must be made at the termination of GAC 314-J is the payment to UCC (not to the Plan) of any balance that may remain in the Active-Life Fund. ECF No. 9 Ex. A-2 at Provision XV(c)(iv), p. 12 (Defendant shall "refund to the Contract-Holder an amount equal to the balance remaining in its Active-Life Fund on the fifth Business Day after such date").

A hearing on Defendant's motion to dismiss was held on July 23, 2012. For the reasons provided herein, Defendant's motion to dismiss will be granted in part and denied in part.

## I.   Legal Standard

Defendant moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Rule 12(b)(1) provides that an action may be dismissed for lack of subject matter jurisdiction. As Plaintiff notes, Defendant phrases its challenge as the Plaintiff's failure to allege an injury-in-fact, a constitutional requirement for standing, *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004), but Defendant's challenge should more accurately be

-9-

characterized as a challenge to the prudential requirements of Aritcle III standing, namely that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 330 F.3d 747, 750 (6th Cir. 2003). Article III of the constitution requires standing to invoke the jurisdiction of a federal court. *B. & V. Distributing Co., Inc. v. Dottore Companies*, LLC, 2006 WL 1134225, *2 (N.D. Ohio 2006) (citing *National Rifle Association of America v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). Where this standing requirement is not satisfied, the Court lacks subject matter jurisdiction over the case. *Id.* (citing *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 622 (6th Cir. 2000)).

Because "federal courts . . . have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," a plaintiff must possess both constitutional and statutory standing in order for a federal court to have jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). Thus, even where statutory standing pursuant to ERISA is satisfied, the elements of Article III must still be met. *Cent. States Se. & Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care*, 433 F.3d 181, 199 (2d Cir.2005). Congress "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997).

As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). If Plaintiff cannot establish constitutional standing, the claims must be dismissed for lack of subject matter jurisdiction. *Cent. States*, 433 F.3d at 198. "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case." *Steel Co. v. Citizens*

*for a Better Env't*, 523 U.S. 83, 94 (1998) (citations omitted). "In reviewing a 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits." *Id.* (quoting *Rogers v. Stratton Industry*, 798 F.2d 913, 916 (6th Cir.1986)).

The court examines the legal sufficiency of the plaintiff's claim under Federal Rule of Civil Procedure 12(b)(6). *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir.1993). When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff's obligation to provide the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, ---, 129 S.Ct. 1937, 1949 (2009). Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. The Sixth Circuit has concluded that a court may consider allegations

-11-

contained in the complaint, as well as exhibits attached to or otherwise incorporated in the complaint, all without converting a motion to dismiss to a motion for summary judgment. Fed. R. Civ. P. 10(c); *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

## II.    Discussion

### A. Plaintiff's Claims Based on the Alleged Change in Dividend Policy

#### 1. Plaintiff's Standing to Pursue the Dividend-Related Claims

Defendant first argues that Plaintiff, a fiduciary of the Plan, lacks standing to bring suit on behalf of the Plan. Plaintiff has the affirmative burden of alleging facts sufficient to demonstrate standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Although Plaintiff alleges that "the Contracts provide for [Defendant]. . . to make annual dividend payments to the Plan," Compl. ¶ 36, Defendant emphasizes that the allegation is contradicted by the Contracts themselves, which provide that any dividend payments are payable to UCC or, at its direction, some other entity; not to the Plan.

The Complaint does not allege that UCC designated the Plan as the recipient of any dividends payable under the Contracts. Defendant argues that the claims alleging failure to pay dividends should be dismissed because UCC has not suffered an injury in fact arising from the alleged failure to pay dividends,. *Loren v. Blue Cross & Blue Shield of Michigan*, 505 F.3d 598, 607 (6th Cir. 2007).

Plaintiff disagrees, and first identifies the allegations of his complaint that he believes respond to Defendant's argument.  Plaintiff notes that the Complaint alleges the Plan's interest in the Contracts, including dividends and the fund balances. *See, e.g.*, Compl. ¶¶ 4, 5, 12, 24, 27, 68, 69. The Complaint also alleges Defendant's breach of its fiduciary duty to the Plan. For example,

-12-

the Complaint states that Defendant "deprived the Plan of its use of valuable plan assets and acted in bad faith when it unilaterally changed the dividend policy without notice and failed to pay dividends under the Contracts." Compl. ¶ 55. The Complaint further states that "[a]s a result of [Defendant's] anticipatory repudiation of its obligation, the fund balances, reflecting years of unpaid dividends, are currently due to the Plan[,]" *id*. ¶ 43, and that Defendant "failed to discharge its fiduciary duties with respect to the Plan by determining not to pay dividends under the Contracts in each year from 1999 to the present, for its own benefit, and repudiating its obligation to remit to the Plan the fund balances under the Contracts." *Id. ¶* 101.

Second, Plaintiff suggests that Defendant's argument does not take into account the fact that the Contracts were acquired by UCC for the purpose of funding the Plan and for no other purpose. Plaintiff asserts that structuring the Contracts with UCC as the nominal party did not reflect any intention to provide for direct distributions to or for the benefit of UCC. Compl ¶¶ 5, 12, 61.

More importantly, Plaintiff emphasizes that this contract right, which might have been exercised in 1937 or 1951 when the Contract language was drafted, became illusory following the passage of ERISA because ERISA clarified UCC's obligation to the Plan. Specifically, ERISA requires that a fiduciary perform his duties "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and provides that assets of a plan may not inure to the benefit of the employer of the participating employees. *Id.* § 1103(c)(1). Further, an ERISA fiduciary must act "in accordance with the documents and instruments governing the plan" but only "insofar as such documents and instruments are consistent with the [fiduciary] provisions of [ERISA]." *Id.* § 1104(a)(1)(D). These obligations could not be circumvented by UCC claiming a right to the Plan's assets by virtue of the terms of the Contracts.

-13-

Since UCC is also a fiduciary of the Plan under ERISA, Plaintiff contends, the same fiduciary obligations that prohibit Defendant from converting the Plan's assets for its own benefit similarly prohibit UCC from directing the Plan's assets to its own use. Plaintiff characterizes Defendant's position as attempting to excuse its own fiduciary misconduct based on its assertion that UCC could have itself committed fiduciary misconduct. Plaintiff believes the parties' conduct demonstrates their understanding that the Contracts were undertaken for the benefit of the Plan and were therefore the Plan's assets. Under ERISA, Plaintiff argues that neither Defendant nor UCC can use them for their own benefit.

Therefore, as to the payment of dividends and fund balances, Plaintiff contends that Defendant's obligation is to be measured under ERISA. Under ERISA's fiduciary rules, an investment manager funding a pension plan subject to ERISA cannot enforce a contract with the plan that allows it to return investment earnings, less some discretionary amount. *See Cent. States*, 472 U.S. at 568 (noting that "trust documents cannot excuse trustees from their duties under ERISA"). Plaintiff claims Defendant would be in violation of ERISA if it made payments to UCC under the Contracts knowing that UCC would use such payments for its own corporate purposes under the co-fiduciary liability provisions of ERISA § 405(a). Also, Defendant would have improperly transferred plan assets to a "party in interest" under ERISA § 406(a)(1)(D).

Plaintiff also argues that Defendant's reliance on the Sixth Circuit's decision in *Loren v. Blue Cross Blue Shield*, 505 F.3d 598 (6th Cir. 2007), is misplaced because the court's decision turns on the plaintiffs' status as individual participants and beneficiaries of a plan governed by ERISA. *Loren*, 505 F.3d at 608-09. Under ERISA § 502(a)(2), both an individual plan participant and a plan fiduciary may bring suit for monetary damages on behalf of a plan for breach of fiduciary duty.

-14-

Either may also request equitable relief under ERISA § 502(a)(3). The difference is that an individual plan participant or beneficiary is "limited to bringing suit on behalf of his or her ERISA plan when asserting a § 1132(a)(2) claim," *Loren*, 505 F.3d at 609, but must also allege an actual injury to the individual apart from the injury to the plan. *Id.* at 608-09. Because there are no individual participants bringing suit here, Plaintiff contends that the decision relating to the *Loren* individual plaintiffs' § 1132(a)(2) claim does not apply. Here, the Complaint adequately alleges an injury-in-fact to the Plan, which was caused by Defendant's conduct, and is redressable by this Court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (setting forth the three elements of constitutional standing); *see also City of Cleveland v. Ohio*, 508 F.3d 827, 836 (6th Cir. 2007) (stating the City asserted its own interests and not that of the non-party whose role was to carry out the duties of the City). Thus, Plaintiff requests that Defendant's motion to dismiss for lack of subject matter jurisdiction be denied.

Plaintiff alternatively suggests that even if the Plan suffered no injury-in-fact, it should be permitted to bring suit because the Plan will receive any dividends payable to UCC.

Under ERISA, the contours of the requisite injury-in-fact depend on whether Plaintiff seeks monetary or injunctive relief. Plaintiff can seek both forms of relief pursuant to 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), which provide:

(a) Persons empowered to bring a civil action

A civil action may be brought . . .

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations

or (ii) to enforce any provisions of this subchapter or the terms of the plan;
. . .

29 U.S.C. § 1109 provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

The language of Provision 12 - Dividends (ECF No. 9-1 at 68) provides that the aggregate amount of the dividend apportioned "shall be applied in whole or in part toward the payment of any contribution under a contract issued by an insurance company and providing benefits for employees of the Employer." The provision explains that the payment is made "as designated by the Employer . . . to the Employer or to a trustee or trustees under an employee's benefit plan" or distributed as the Employer determines among "any two or more of (i) the Employer, (ii) a trustee or trustees designated by the Employer, and (iii) any such contracts. *Id.* The contract language is consistent with Plaintiff's allegation that the dividend policy contemplates any participatory surplus to benefit the employees receiving annuity benefits under the contracts, not exclusively UCC. There has been no suggestion that UCC would assert that the dividends are not an intended employee benefit. Because the employees are intended beneficiaries of the annuity arrangement, and because Plaintiff's complaint allegations are consistent with the language of the Contacts, Defendant's motion to dismiss Plaintiff's claims for lack of standing will be denied.

**2. The Statute of Limitations Has Expired for All Claims Relating to the Alleged Failure to Pay Dividends.**

**a. Plaintiff's Statutory ERISA Claims (Counts I, II, IV, and V)**

A claim for breach of any fiduciary responsibility, duty, or obligation under ERISA must be brought within six years after the breach. 29 U.S.C. § 1113.9. Plaintiff alleges that Defendant violated ERISA by changing its dividend policy in March 1998. This action was filed in February of 2012, almost fourteen years later. Defendant argues that any claim based on its action in 1998 is barred by the six-year statute of limitations.

Defendant notes that Plaintiff attempts to evade the limitations bar to his claims by invoking a narrow fraud exception (Compl. Count IV), which provides that "in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation." In order for this exception to apply, Plaintiff must allege "(1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) the plaintiffs were not on actual or constructive notice of that evidence, (3) despite their exercise of diligence." *Brown v. Owens Corning Investment Review Committee*, 622 F.3d 564, 573 (6th Cir. 2010); *see also Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir. 1996).

Defendant argues that the exception to the six-year statute of limitations for cases of fraud does not apply here. First, Defendant's Dividend Letter expressly told Plaintiff "it is unlikely that future dividends will be declared on the class of business to which this contract belongs" and that "experience losses for this class of business" were "unlikely . . . [to] be offset by gains from investment income." ECF No. 9 Ex. A-3. The Complaint itself makes clear that the Plan was aware

of the alleged breach. Defendant did not pay a dividend in March 1999 or in any subsequent year, despite the Plan's belief that dividends were "due." Compl. ¶ 42. The Plan understood that this was a departure from the payment of dividends in previous years and was aware that dividends were paid in March of 1999 and in subsequent years by Prudential. According to Plaintiff, "the obligations of the insurance companies under the Contracts are identical" – even though, for years, dividend payments from the two companies were not. Defendant notes that as support for his claims, Plaintiff has monthly reports providing financial information on the Contracts from 1998 through 2009.

The extended statute of limitations provided for in cases of fraudulent concealment is intended to protect victims of fraud. *See, e.g.*, *Chaaban v. Criscito*, No. 08-CV-1567 (WJM), 2008 U.S. Dist. LEXIS 49569, at *2 (D.N.J. June 24, 2008), *aff'd*, 2012 U.S. App. LEXIS 4710 (3d Cir. Mar. 7, 2012) (applying exception to six-year statute of limitations where trustee stole money from pension fund and then took affirmative steps to conceal his actions, which were ultimately discovered by a successor trustee). The extended statute of limitations is not intended to excuse plaintiffs who fail to act diligently to protect themselves. In this case, Defendant argues that Plaintiff's own allegations demonstrate that Defendant did not undertake any course of conduct to conceal any financial information, and that the Plan had either actual or constructive knowledge of the alleged change in dividend policy and the nonpayment of dividends. Defendant emphasizes that the Plan's failure to assert its interests for more than a decade refutes the required showing of diligence.

The fraud or concealment exception of ERISA § 413(2) applies where a fiduciary "(1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; or (2) engaged in acts to hinder the discovery of a

-18-

breach of fiduciary duty." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 190, 192 (2d Cir. 2001) (cited with

approval in *Cataldo v. U.S. Steel Corp.*, -- F.3d ---, No. 10-3583, 2012 WL 1232642, *5 (6th Cir.

Apr. 13, 2012)). Applying the fraud or concealment exception, Plaintiff argues that the Plan may

recover for all dividends that should have been paid since 1999, because Plaintiff filed suit against

Defendant within six years of its discovery of ERISA violations. The exception applies because (i)

Defendant's failure to disclose the dividend policy change as required constitutes fraud; (ii) the

Dividend Letter constitutes an affirmative act of fraud; (iii) if the duty to inquire was even triggered,

the Plan took the actions of a diligent pension plan by complying with ERISA and DOL audit

procedures; and (iv) the Plan first learned about Defendant's fraud in 2010 through the assistance

of the NYSID.

GAC 142-J and GAC 314-J have comprised a "class of contracts," for purposes of dividend

payments under the Contracts, since 1973. Compl. ¶ 40. Despite contractual language requiring that

the pooled investment experience of the Contracts be considered alone, Defendant unilaterally

changed the Contracts' dividend policy and began grouping the Contracts with other historically

underfunded group annuity contracts. Plaintiff asserts that Defendant did not disclose the change in

dividend policy to the Plan. *See* 29 U.S.C. § 1104(a).

By not disclosing these changes, Plaintiff argues that Defendant also ignored federal law

regarding its fiduciary obligations. Defendant's duties as a fiduciary encompass "not only a negative

duty not to misinform, but also an affirmative duty to inform when . . . silence might be harmful."

*James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 452 (6th Cir. 2002) (internal citation omitted);

*accord Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1163 (6th Cir. 1988) (ERISA fiduciaries "may

not materially mislead those to whom the duties of loyalty and prudence described in 29 U.S.C. §

-19-

1104 are owed."). Plaintiff argues Defendant had a duty to make detailed disclosures to the Plan, yet at no time prior to the commencement of this litigation did MetLife make the disclosures required by ERISA. Plaintiff contends that the accurate information did not become known to the Plan's representatives until they received information from the NYSID one month before entering into a tolling agreement. By failing to make these disclosures as required by law, Defendant committed fraud for the purposes of ERISA, and the statute of limitations under ERISA was tolled. *See, e.g.*, *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 323-24 (2d Cir. 2004) (tolling the ERISA statute of limitations where a defendant failed to make disclosures required by federal regulations).

Plaintiff believes that Defendant committed an additional fraud when it sent the Plan the Dividend Letter. The inaccuracies become particularly apparent when the statements in the Dividend Letter are compared with the explanations contained in Defendant's private submissions to the NYSID. Compl. ¶¶ 9, 10, 45-47. "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in [ERISA] § 404(a)(1)." *See Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 843 (6th Cir. 2003) (internal citations omitted). Plaintiff asserts that Defendant's letter constitutes fraud and an affirmative act of concealment, *see Chaaban v. Criscito*, No. 08-CV-1567 (WJM), 2008 U.S. Dist. LEXIS 49569, at *2 (D.N.J. June 24, 2008) (applying the fraud or concealment exception where a defendant "intentionally concealed his breach of fiduciary duties to the ERISA plan"), and Defendant's false and misleading statement triggered a duty to make corrective disclosures that it failed to meet.

Defendant argues that the fraud provision is unavailable because the Plan "faile[d] to take steps to assert its [] rights for more than a decade." ECF No. 11. Plaintiff contends that this argument

fails for multiple reasons. First, the Sixth Circuit has not resolved whether in addition to alleging fraud under ERISA § 413, a plaintiff must also allege diligence in uncovering the fraud in the face of a defendant's actions. *See Cataldo*, -- F.3d ---, 2012 WL 1232642, *4-5 (assuming without deciding that diligence is required). Second, the Plan did not have any information suggesting wrongdoing on Defendant's part. *See In re Merck & Co.*, 543 F.3d 150, 164 (3d Cir. 2008) (stating diligence depends on whether plaintiffs "had sufficient information of possible wrongdoing to place them on inquiry notice"). Defendant's Dividend Letter provided a rational explanation for the cessation of dividends—changes to actuarial experience. Given its trust in Defendant, which by 1998 had managed the Plan's assets for more than sixty years, the Plan had no reason to question Defendant's statements. Defendant's ongoing provision of financial statements led the Plan to believe that the fund balances that were accumulating would be returned to the Plan upon termination. Third, the Plan acted reasonably and satisfied any "hypothetical diligence" required. *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982) (noting that where due diligence is required, plaintiffs need only show "hypothetical diligence"); *accord In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 802-03 (N.D. Ohio 2011) (finding complaint established there were no facts that "should have excited [p]laintiff's suspicions about" defendants' actions).

Because Congress passed ERISA to protect pension plan assets, the level of diligence required by ERISA and the DOL regulations exemplifies what is reasonable and more than satisfies any "hypothetical diligence" standard. Plaintiff notes that in all relevant years, the Plan was required to conduct internal audits of its financial statements in compliance with ERISA and DOL regulations. *See* 29 U.S.C. § 1023(a)(3)(A); DOL regulation 29 C.F.R. § 2520.103-1 et seq. Pursuant to these requirements, the Plan engaged independent accounting firms, obtained certifications

regarding the accuracy and completeness of Plan information, and submitted comprehensive Form 5500 reports for inspection by the DOL. Defendant does not contend that the Plan failed to comply with any of these required pension plan audit procedures or that any such procedures raised, or should have raised, any "red flags" regarding Defendant's explanation that dividend payments had been affected by changing actuarial assumptions; or that there were any hints of possible misconduct on Defendant's part. *See In re Merck & Co.,* 543 F.3d at 164.

The Plan ultimately learned of Defendant's dividend policy change in 2010 following an investigation into the financial stability of the Plan and requests for assistance from the NYSID. The Plan's initial investigation was undertaken to better understand the differing fund balances that were developing between the portions of the Contracts administered by Defendant and Prudential. Compl. ¶ 44. However, Defendant's obfuscation changed the focus of the investigation to its treatment of the Plan's assets. Moreover, Plaintiff contends that the time and expense required to obtain an explanation went far beyond what was required. *See Holland v. Florida*, -- U.S. --, 130 S. Ct. 2549, 2565 (2010) (clarifying the tolling standard requires "reasonable diligence, not maximum feasible diligence") (internal quotations and citations omitted). Plaintiff represented that Defendant also provided shifting and misleading information that further hindered the Plan's discovery of its dividend policy change—nearly rendering the Plan's investigations futile. Because the fraud or concealment exception applies, Plaintiff urges the Court to conclude that the Plan's claims are timely since it commenced this action within six years of its 2010 discovery of Defendant's breach. *See* 29 U.S.C. § 1113(2).

Defendant responds that Plaintiff's arguments are without merit. Despite the well-developed body of law on the statute of limitations in ERISA cases, Defendant suggests that Plaintiff has

simply cited an array of cases involving other statutes. The cited cases articulate various rules concerning equitable estoppel and fraudulent concealment, but the relevant law provides that Plaintiff's claims are time-barred by ERISA's six-year statute of limitations unless Defendant engaged in fraud or fraudulent concealment that prevented him from bringing suit within the relevant six-year period. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 550-51 (6th Cir. 2012); *Brown v. Owens Corning Invest. Review Comm.*, 622 F.3d 564, 573 (6th Cir. 2010). Defendant contends it disclosed what it was doing in 1998. The Dividend Letter provided: "it is unlikely that future dividends will be declared on the class of business to which this contract belongs" and that "experience losses for this class of business" were "unlikely… [to] be offset by gains from investment income." ECF No. 13 Ex. A-3. That letter, coupled with the absence of dividend payments from Defendant after 1998 and the contrast with dividend payments by Prudential, placed Plaintiff on notice of the change in Defendant's dividend policy.

Defendant claims once Plaintiff had "information sufficient to alert a reasonable person to the possibility of wrongdoing," it had a "duty to inquire into the matter with due diligence." *Med. Mut. of Ohio v. K. Amalia Enters. Inc.*, 548 F.3d 383, 391 (6th Cir. 2008). At an absolute minimum, upon receipt of the Dividend Letter, Plaintiff should have asked what Defendant meant by the "class of business to which this contract belongs."

Plaintiff argues in the alternative that every year that Defendant exercises its discretion as a fiduciary to apply an incorrect dividend policy, it commits a new, distinct breach of its ERISA obligations. *See Bona v. Barasch*, No. 01 Civ. 2289 (MBM), 2003 WL 1395932, *16-19 (S.D.N.Y. Mar. 20, 2003) (holding that an ERISA violation accrued each time faulty investment contracts were renewed because ERISA fiduciaries had a continuing duty to review plan investments); *Buccino v.*

-23-

*Cont'l Assurance Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) (same); *see also Purnell v. Arrow Fin. Servs.*, LLC, 303 F. App'x 297, 302-04 (6th Cir. 2008) (endorsing a similar rule of accrual in action brought under a federal debt collection statute). Accordingly, under ERISA § 413(1), Plaintiff submits that the Plan may recover—even without demonstrating the fraud or concealment exception—all dividend payments that should have been made to the Plan since 2003, which is six years from the date of the last breach after accounting for the three-year period covered by the tolling agreement.

Defendant responds that Plaintiff's alternative argument that each year's failure to pay dividends constitutes a new violation is inconsistent with his allegations and the caselaw. Plaintiff's claims are based on the allegation that Defendant violated ERISA by changing its dividend policy in 1998. Compl. ¶¶ 45, 46. Thus, Plaintiff's claims are based on a distinct event and the limitations period runs from the original wrongful act and is not restarted each time a plaintiff suffers incremental, additional injury flowing from the same event. *Med. Mut. of Ohio*, 548 F.3d at 394; *see also Miele v. Pension Plan of N.Y. State Teamsters Conference Pension & Ret. Fund*, 72 F. Supp. 2d 88, 102 (E.D.N.Y. 1999) ("continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time"); *see also Rabouin v. Metropolitan Life Ins. Co.*, 2005 WL 3536441, at *9 (N.Y. Sup. Ct. Nov. 23, 2005) (holding that limitations period was not re-triggered each time defendant calculated the dividend, if any, under existing dividend policy and that contract claims were time-barred). Defendant's analysis on this point is sound. The fact that Defendant calculated dividends each later year uniformly applying the new methodology does not constitute a new violation.

Defendant's additional arguments are unpersuasive. Its contention that it disclosed the

-24-

diminished likelihood of future dividends is not disclosure of a change in the methodology of their calculation. It was not unreasonable for the Plan to rely on Defendant's explanation given the long-standing relationship and the reasonableness of the explanation provided. Indeed, the Plan continued to conduct yearly internal audits as required by ERISA and DOL regulations and the fact that Prudential paid dividends when Defendant did not is insufficient to inform Plaintiff that Defendant had changed its method of accounting for dividends. Defendant likewise does not address Plaintiff's contention that it withheld information when the Plan requested the information during its investigation. Consistent with the applicable pleading requirements, Plaintiff has alleged the time, place, and content of the alleged misrepresentation on which the Plan relied, the allegedly fraudulent scheme and intent and the injury resulting from the alleged fraud. Fed. R. Civ. P. 9(b); *see also Cataldo*, 676 F.3d at 551. Plaintiff has reasonably met his burden of pleading an exception to the statute of limitations based on fraud or concealment. Defendant's motion to dismiss on this basis will be denied.

**b. Plaintiff's Restitution and Unjust Enrichment Claim Under Federal Common Law**

Plaintiff's claims for restitution and unjust enrichment under federal common law constitute claims for equitable relief under section 502 of ERISA, 29 U.S.C. § 1132(a)(3)(B). Accordingly, the relevant statute of limitations is the forum state's statute of limitations for the most analogous cause of action. *Winnett v. Caterpillar, Inc*., 609 F.3d 404, 408 (6th Cir. 2010) (borrowing statute of limitations from the law of the forum state). The Michigan statute of limitations for restitution and unjust enrichment is six years*. Iron Workers' Local 25 Pension Fund v. Sova Steel, Inc*., No. 08-13074, 2009 U.S. Dist. LEXIS 107665, *16 (E.D. Mich. Nov. 18, 2009); *Currithers v. FedEx Ground Package Sys., Inc*., No. 04-10055, 2012 U.S. Dist. LEXIS 17327, *10 (E.D. Mich. Feb. 13,

2012). Therefore, Defendant argues that the statute of limitations for the federal common law claim expired long before this action was brought.

Plaintiff responds that the Plan's federal common law claims are timely under the discovery rule and the fraudulent concealment doctrine. *See SEC v. Gabelli*, 653 F.3d 49, 59-60 (2d Cir. 2011) (describing the discovery rule as an accrual doctrine and fraudulent concealment as a tolling doctrine). Under the general formulation of the discovery rule, statutes of limitation "accrue when the litigant first knows or with due diligence should know facts that will form the basis for an action." *Merck & Co. v. Reynolds*, -- U.S. ---, 130 S. Ct. 1784, 1794 (2010) (citing C. Corman, Limitation of Actions §§ 11.1.1, at 134 (1991 and 1993 Supp.)) (markings omitted). This limitations period is subject to additional tolling for fraudulent concealment where a defendant engages in conduct that prevents the plaintiff from discovering the cause of action within the limitations period. *See Veltri*, 393 F.3d at 324. As previously noted, Plaintiff has adequately pled that Defendant's conduct constituted fraud and active concealment that delayed discovery of the dividend policy change, and that the Plan was diligent. For the reasons explained in the previous section, Defendant's motion to dismiss these claims will also be denied.

### 3. Plaintiff's Allegations Regarding the Alleged Change in Dividend Formula

### a. Defendant as a Fiduciary under Plaintiff's Statutory ERISA Claims (Counts I, II, IV, V)

In Counts I and II, Plaintiff asserts claims for breach of ERISA fiduciary duties. ERISA provides that "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(I). Plaintiff maintains that the Contracts provide for annual dividends to be paid to the Plan, making

those dividends Plan assets. *See, e.g.*, Compl. ¶¶ 93, 101.  According to Plaintiff, Defendant exercised authority or control over those dividends, which imposed a fiduciary duty; and Defendant breached that duty when it did not pay dividends to the Plan.

Plaintiff relies on *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, 510 U.S. 86 (1993), in support of this proposition.  In *John Hancock*, the Supreme Court interpreted the definition of "plan assets" under ERISA policies.  *Id*. at 89.  The Court found that "free funds are 'plan assets,'" and that management of free funds "must be judged against ERISA's Fiduciary Standards."  *Id*. at 106.  The Court, analyzing Section 401(b) of ERISA, held that non-segregated funds located in an insurance company's general account constitute plan assets to the extent they are available for "something other than guaranteed payments to plan participants[.]" *Id*. at 105.  Because John Hancock did not guarantee that benefits in any amount would be payable from the free funds, the Court concluded that the funds were plan assets. *Id*. at 106.

Plaintiff contends that the premiums Defendant collected and invested that were not used to fund annuity benefits are the equivalent of free funds, because their amount and their investment were determined by the Defendant. Indeed, shortly following the Supreme Court's decision in *John Hancock*, the Department of Labor, the agency charged with administering and enforcing ERISA, summarized the decision in a manner that supports this conclusion. The DOL stated "[t]he Supreme Court held that those funds allocated to an insurer's general account pursuant to a contract with a plan that vary with the investment experience of the insurance company are 'plan assets' under ERISA." Class Exemption for Certain Transactions Involving Insurance Company General Accounts, 59 Fed. Reg. 43137 (proposed Aug. 22, 1994).

Defendant attempts to distinguish *John Hancock*, arguing that unlike the contract in that case, the Contracts here do not explicitly refer to "free funds" payable to the Plan, but only refer to possible dividend payments. The absence of such specific language is, however, of no legal relevance. As with the *John Hancock* contract, the excess funds in this case do not provide for guaranteed benefits. This was confirmed by Defendant when it described the funds as "positive surplus," and paid them to the Plan, in the form of dividends, for many years.

Defendant also argues that because the Contracts allow UCC to direct dividend payments, Defendant's decisions do not involve the management or disposition of Plan assets. Defendant contends that this argument is bolstered by guidance from the DOL. According to the DOL, "plan assets should be identified based on 'ordinary notions of property rights.' " *Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 105 (2d Cir. 2011) (citing U.S. Dep't of Labor, Advisory Op. No. 93-14A (May 5, 1993)) (plan assets will "include any property, tangible or intangible, in which the plan has a beneficial ownership interest," considering "any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved")). Defendant argues that because UCC has the power to direct the payment of dividends, it owns the right to any dividends.

Defendant's argument, however, simply addresses who would direct the dividend payments once they were declared. Pursuant to the DOL's ownership test, the conduct of the parties should be considered. UCC has consistently treated the Contracts and any dividends as Plan assets. They have been identified as Plan assets for purposes of financial accounting, reporting to the DOL, and reporting to Plan participants. Yes, UCC has authority to direct the payments once they are declared; but UCC has unconditionally directed these payments to the Plan. Further, ERISA dictates that UCC cannot exercise its right to direct payments in a manner that deprives the Plan the benefit

of its assets. The "free funds" contemplated in *John Hancock* are analogous to the divisible surplus in the Contracts, and support Plaintiff's assertion that Defendant owed the Plan a fiduciary duty with respect to the calculation and payment of dividends. Defendant's motion to dismiss on this basis will be denied.

### b. Plaintiff's Unjust Enrichment (Count III) and Equitable Estoppel Claims (Count IV)

Plaintiff alleges that the failure to pay dividends to the Plan has "unjustly enriched" Defendant, and that the Plan is entitled to restitution of "the reasonable value that should have been remitted to the Plan as dividends." Compl. ¶¶ 111, 115. Defendant asserts that when the relationship between the parties is founded on a written instrument, generally a plaintiff cannot bring an unjust enrichment claim based on allegations that the plaintiff is entitled to amounts other than what the contract provides. *See, e.g.*, *APJ Assocs. v. N. Am. Philips Corp.*, 317 F.3d 610, 617 (6th Cir. 2003) ("well-settled law holds that the . . . claim of unjust enrichment . . . is only appropriate in the absence of an express contract"). This principle has been followed in ERISA cases to bar unjust enrichment claims under federal common law. *See Ferry v. Mutual Life Ins. Co. of New York*, 868 F. Supp. 764, 776-77 (W.D. Penn. 1994) (refusing to recognize a federal common law claim for unjust enrichment where "the relationship of the parties is founded upon a written agreement" and plaintiffs failed "to demonstrate the 'particularly strong affirmative indication that such a [claim] would effectuate [ERISA] statutory policy' ") (citing *Luby v. Teamsters Health Welfare Pension Funds*, 944 F.2d 1176, 1186 (3d Cir. 1991)).

In this case, Defendant argues that any right to dividend payments is governed by the Contracts, which provide for dividend calculations based on the class of contracts to which they belong, rather than the individual Contracts taken alone. As a matter of contract law, insurance

companies like Defendant are afforded broad discretion in determining the amount of dividends to be declared and the manner in which such dividends are allocated among policyholders. *See, e.g.*, *Rhine v. N.Y. Life Ins. Co.*, 273 N.Y. 1, 6 N.E.2d 74 (1936); *Rebbert v. New England Mutual Life Ins. Co.*, No. 600457/97, 1998 N.Y. Misc. LEXIS 718 (Sup. Ct. N.Y. Cty. 1998). Defendant contends that Plaintiff has offered no basis for recognizing a federal common law claim under these circumstances and requests Plaintiff's claim be dismissed.

Plaintiff responds that the Sixth Circuit has expressly recognized "a common law cause of action in restitution to prevent unjust enrichment" in the context of ERISA pension benefit plans. *Whitworth Bros. Storage Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 1006, 1018 (6th Cir. 1993). The Complaint alleges that by redirecting the divisible surplus under the Contracts from the Plan to itself, Defendant breached trust and fiduciary principles, and enriched itself at the Plan's expense. Compl. ¶¶ 1, 109- 16; *see Provident Life & Accid. Ins. Co. v. Waller*, 906 F.2d 985, 993-94 (4th Cir. 1990) (holding that plaintiff in ERISA action was entitled to restitution under similar circumstances). ERISA also incorporates the law of trusts with regard to fiduciary relationships and fiduciary responsibilities. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989). Accordingly, Plaintiff submits that Defendant's obligations with respect to the Plan are not confined to the "four corners" of the Contracts. Instead, they encompass fiduciary duties that go well beyond what contract or insurance law requires, limiting the discretion Defendant might otherwise enjoy. *See* ERISA § 404(a)(1)(A)-(D) (outlining fiduciary duties).

Defendant emphasizes that there are numerous ERISA cases dismissing a plaintiff's purported unjust enrichment claim. *See* ECF No. 9 at 16-17; see *also see also Essex v. Randall*, 2005 WL 600335, at *5 (D. Md. Mar. 15, 2005) (rejecting unjust enrichment claims in the ERISA context

when an express contract governs the parties' relationship). Those cases make clear that courts do not lightly fashion remedies like restitution where other remedies exist. Nonetheless, Plaintiff cites two cases where such a remedy was permitted. *See* ECF No. 13 at 19 (citing *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 993-94 (4th Cir. 1990); *Whitworth Bros. Storage Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 1006, 1018 (6th Cir. 1993)). Both cases involve attempts to recover mistaken overpayments of premiums or benefits where there was no contractual right to recover – a fact pattern where unjust enrichment claims are routine. *See, e.g.*, *Eberspacher v. Mutual of Omaha Ins. Co.*, 2005 WL 1377865, at *11 (D. Neb. June 8, 2005) (collecting cases). The availability of a claim for unjust enrichment to compel restitution of an overpayment does not, according to Defendant, support recovery here.

Plaintiff responds that whatever the Contracts permit is irrelevant, because under "trust and fiduciary principles," the Plan "reasonably expected" dividend payments.  ECF No. 13 at 19. Defendant asserts that the applicability of "trust and fiduciary principles" here depends on the underlying question of whether the assets at issue are "plan assets," which as discussed previously, were contemplated to be Plan assets under the terms of the Contracts.

Plaintiff emphasizes that Defendant provides no legal basis for dismissing the Plan's equitable estoppel claim, except to state that it is a tolling argument rather than an independent claim for relief. While equitable estoppel may justify tolling as discussed below, it is "not limited to the statute of limitations context." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). Instead, equitable estoppel is a general equity principle that permits courts to grant equitable relief when it is deemed proper. *See, e.g.*, *Smiljanich*, 302 F. App'x at 448-49; *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991) (using equitable estoppel to bind a defendant to its prior

-31-

promise to pay ERISA benefits). Count IV asserts that Defendant "should be precluded from raising any laches or limitations defense under federal common law and the statute of limitations provisions of ERISA." Compl. ¶ 121. Defendant contends that Plaintiff's opposition now belatedly attempts to transform Count IV into an affirmative claim for recovery.

Defendant is correct. Plaintiff's equitable estoppel claim does not plead a claim for affirmative relief. Instead, the claim requests that the doctrine of equitable estoppel be applied simply to bolster its tolling or fraudulent concealment argument rather than an independent claim for relief.  The claim will be dismissed.

## II. PLAINTIFF'S CLAIMS BASED ON AN ALLEGED REFUSAL TO PAY "FUND BALANCES" TO THE PLAN WHEN THE CONTRACTS TERMINATE

Plaintiff also claims the Plan is entitled to any "fund balance" remaining in the Contracts upon their termination. Compl. ¶ 24; *see also* ¶¶ 4, 11, 14, 34, 43. Plaintiff defines "fund balances" as "the remaining divisible surplus . . . [w]hen the Contracts terminate." *Id. ¶ 4*.

Defendant argues that the Contracts do not provide for the payment of "remaining divisible surplus" after they terminate. However, GAC 314-J does provide for a "refund" under specific circumstances, although it is payable at UCC's direction. ECF No. 9 Ex. A-2 at Provision XV(c)(iv). The amount refundable under Provision XV(c)(iv) is equivalent to the amount of any "remaining divisible surplus" at contract termination. As before, this surplus constitutes "free funds," and as such can be considered a Plan asset.  There is no provision in the Contracts that provides for Defendant's retention of funds representing unpaid dividends at contract termination.  Plaintiff has adequately stated a cause of action for return of the fund balances.

### III.    Conclusion

Accordingly, it is **ORDERED** that Defendant's motion to dismiss (ECF No. 9) is

**GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Plaintiff's claim for equitable estoppel (Count IV) is

**DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 26, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 26, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS
