UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GARY McGUIRE,

        Plaintiff,                            Case No. 12-10797
                                              Honorable Thomas L. Ludington

v.

METROPOLITAN LIFE
INSURANCE COMPANY,

        Defendant.

_____/

**OPINION AND ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT,
DENYING WITHOUT PREJUDICE MOTIONS TO EXCLUDE EXPERTS, DENYING
MOTION TO STRIKE, AND DIRECTING PARTIES TO SHOW CAUSE**

For many years, Metropolitan Life Insurance Company (MetLife) and Prudential Insurance Company of America (Prudential) jointly managed two contracts (the Contracts) that guaranteed pension benefits for employees enrolled in the Union Carbide Employees' Pension Plan (the Plan). The premiums paid under the Contracts—which ceased in 1994—were divided evenly between MetLife and Prudential, and MetLife and Prudential likewise shared responsibility for benefits to qualifying beneficiaries.

Gary McGuire, on behalf of the Plan, alleges that the Contracts impose on MetLife fiduciary responsibilities under the Employee Retirement Income Security Act (ERISA), and that MetLife breached those fiduciary obligations while managing plan assets. MetLife, on the other hand, argues that it never managed plan assets, and therefore is not a fiduciary under ERISA.

Both parties have filed motions for summary judgment, as well as motions challenging the opposition's expert witnesses. Based on what follows, the motions will all be denied.

**I**

Union Carbide and Carbon Corporation was incorporated under the laws of the State of New York on November 1, 1917.  *See* Union Carbide History, *available at* http://www.unioncarbide.com/history (last accessed July 14, 2014).  Union Carbide and Carbon Corporation was involved with the commercial preparation of ethylene—a colorless, flammable gas widely used in the chemical and agricultural industries.  In 1957, Union Carbide and Carbon Corporation became simply Union Carbide Corporation (Union Carbide).  Union Carbide continued to be actively involved in the petrochemical industry, including ethylene manufacturing, throughout the rest of the 20th Century.  Then, on February 6, 2001, Union Carbide became a wholly owned subsidiary of The Dow Chemical Company.  This lawsuit results from the operation of a pension benefits plan that was created for the benefit of Union Carbide employees (again, the Plan), which in turn entered into the Contracts with MetLife and Prudential.

**A**

In 1937, while Union Carbide was still known as Union Carbide and Carbon Corporation, MetLife and Prudential issued Union Carbide Group Annuity Contract Number GA-142-J (142-J).  The purpose of 142-J was to "provide pension benefits to retired employees" who were enrolled in the Plan.  *See* Def.'s Mot. Summ. J. 1, ECF No. 45.  Under 142-J, Union Carbide made payments to MetLife and Prudential for employees covered by the Plan, and MetLife and Prudential were severally liable for the retirement annuity benefits that accrued under the Contract.  *See* 142-J, at 1, *attached as* Pl.'s Summ. J. Br. Ex. 3, ECF No. 71.  Since 1937, 142-J has been amended several times.

- 2 -

In 1951, MetLife and Prudential entered into Union Carbide Group Annuity Contract Number 314-J (314-J).  Like 142-J, 314-J was intended to provide pension benefits for retired employees who were enrolled in the Plan, and again MetLife and Prudential were responsible for those benefits in exchange for periodic payments from Union Carbide.  Contract 314-J has also been amended a number of times since it was first executed.  Prudential, as the lead administrator of both 142-J and 314-J, was responsible for the "day-to-day" communication with the Plan.  *See* Adler 30(b)(6) Dep. 226, *attached as* Pl.'s Summ. J. Br. Ex. 17 (MetLife Vice President and Actuary Rhea Adler testifying as MetLife corporate representative pursuant to Federal Rule of Civil Procedure 30(b)(6)).

Contracts 142-J and 314-J—in addition to providing for guaranteed employee retirement benefits—also provide for annual dividend payments if a divisible surplus is declared.  Contract 142-J provides: "During the Active Term hereof, this Contract is a participating Contract, and the Insurance Companies will, during such Active Term, annually ascertain and apportion as a dividend to this Contract its share of any divisible surplus accruing under contracts of this class." 142-J, at 22.  The Contract establishes that dividends are payable to Union Carbide, or at its direction, to an insurance company, employee benefit plan, or the trustee of such a plan that provides benefits to Union Carbide employees.  *Id.*  The Contract does not require any dividends to be used to pay additional benefits to the employee beneficiaries of the Plan.

Contract 314-J contains almost identical language: "Each Insurance Company will annually ascertain and apportion as a dividend to this Contract its share of any divisible surplus of such Insurance Company accruing under contracts of this class."  314-J, at 6a, *attached as* Pl.'s Summ. J. Br. Ex. 2.  Any such dividends are to be paid to Union Carbide or its designee as follows:

> [A]ny dividends or other amounts which would otherwise be credited to the Contract-Holder shall be applied in whole or in part toward the payment of any contribution under a contract issued by an insurance company and providing benefits for employees of the Contract-Holder, as designated by the Contract-Holder in a written notice to the Insurance Companies, or, if the Contract-Holder so designates, such amount shall be paid to a trustee or trustees under an employees' benefit plan and designated by the Contract-Holder in such request, or such amount shall be distributed in such proportion as the Contract-Holder shall determine among (i) any such trustee or trustees and (ii) any such contracts.

*Id.* at 1973 Amendment ¶ 3(e).

Relevant to this case, the way dividends are calculated under both Contracts—after a divisible surplus is declared—was amended in 1973. Instead of calculating dividends based on each Contract alone, both 142-J and 314-J are to be considered together. Contract 142-J was amended as follows: "In determining the portion, if any, of the divisible surplus accruing under this Contract, each of the Insurance Companies will take into consideration for calendar years after 1972 its experience under [314-J] issued by the Insurance Companies to the Employer." 142-J, at 22. Contract 314-J was similarly amended: "In determining the portion, if any, of the divisible surplus accruing upon this Contract, each Insurance Company will take into consideration for calendar years after 1972 its experience under [142-J] issued to the Contract-Holder by the Insurance Companies." 314-J, at 1973 Amendment ¶ 4.

**B**

Over the years, premiums paid by the Plan pursuant to the Contracts and subsequent investment experience outpaced MetLife's and Prudential's expenses for providing necessary employee benefits, resulting in MetLife's retention of surplus funds. MetLife holds its share of those funds in a "general" account.[1] Through 1997, both MetLife and Prudential paid back

---

[1] Although MetLife's records indicate fund balances of "$21,533,596 for contract 142-J, and $1,151,022 for contract 314-J" at the end of 2012, MetLife argues these are "hypothetical mathematical values used for recordkeeping purposes" only, and therefore "do not represent amounts held in actual separate accounts." Def.'s Response to Pl.'s Interrogatory No. 12, *attached as* Pl.'s Summ. J. Br. Ex. 7.

portions of this surplus in yearly dividends pursuant to the Contracts' related provisions.  For example, Prudential and MetLife paid a combined $4,118,040 in dividends at the end of 1990.  *See* 1990 Form 5500 Filing Info. 5, 6, *attached as* Def.'s Summ. J. Br. Ex. 18, ECF No. 76.  Even after these disbursements, the two Insurance Companies held almost $30 million in surplus funds ($13,412,884 held by Prudential; $16,463,513 held by MetLife).  *Id.*

On March 11, 1998, Louis A. Qualia—MetLife's Director of Client Relations—sent a letter to John Switzer, Union Carbide's Corporate Director.  *See* Mar. 11, 1998 Letter, *attached as* Pl.'s Summ. J. Br. Ex. 42.  First, Qualia explained that for 1997, MetLife was authorizing "[a] dividend of $686,090 and interest on the dividend of $11,435" under 142-J.  *Id.*  But Qualia went on to explain that future dividend payments under the Contracts were unlikely:

> Please note, however, because of steadily improving mortality over the years it is unlikely that future dividends will be declared on the class of business to which this contract belongs.  Over the last 20 years life expectancies have increased significantly.  Annuitants are now projected to receive benefits for approximately 10% longer than previously assumed.  Since annuity benefits are fully guaranteed by MetLife, the payment of these unexpected benefits to annuitants creates experience losses for this class of business.  Because of the current low interest environment, it's unlikely that these mortality losses can be offset by gains from investment income.   Of course, if future experience is significantly more favorable than we expect, future dividends may be declared.

*Id.*  And since 1998, the Plan has not received dividend payments from MetLife, as forewarned, even though Prudential continued to apportion and pay dividends each year for its share of the Contracts.  *See*, *e.g.*, 2000 Form 5500 Filing Info. 3, *attached as* Def.'s Summ. J. Br. Ex. 27 (indicating that for the calendar year 2000 Prudential paid a dividend of $470,000 under 142-J, while MetLife did not pay any dividend).  As a result, a disparity emerged between the funds held by Prudential and the funds held by MetLife.  *See* Spaulding Memo. 1, *attached as* Pl.'s Summ. J. Br. Ex. 40 (indicating that "[a]s of December 31, 2008, the fund balance for MetLife's portion of Contract 142J was $18,198,421 and the fund balance for MetLife's portion of Contract

314J was $971,535. As of the same date, the fund balance for Prudential's portion of the Contract 142J was $964,672 and the fund balance for Prudential's portion of the Contract 314J was $15,034.").

## C

McGuire did not file suit on behalf of the Plan as soon as MetLife's dividend payments stopped. Despite the lack of payments, MetLife continued "to provide information on the[] [C]ontracts" upon request; information MetLife knew the Plan used "for Form 5500 purposes."[2] Adler 30(b)(6) Dep. 149, 150. As the surplus contained in MetLife's general account continued to grow—amounting to just under $23 million as of December 31, 2012—the Plan reported "the full fund balances" as its asset, relying on the information MetLife provided. Pl.'s Summ. J. Br. 17; *see also* Premo 30(b)(6) Dep. 27–34, *attached as* Pl.'s Summ. J. Br. Ex. 13 (Dow Chemical Company tax accountant manager Julie Premo testifying as Plan representative pursuant to Federal Rule of Civil Procedure 30(b)(6), and indicating that the Plan consistently listed surplus held in MetLife's account as a Plan asset on Form 5500 filings). At all times, the Plan anticipated that any surplus held in MetLife's account would be returned upon termination of the Contracts. *See* Pl.'s Compl. ¶ 24 ("The Plan is also entitled to any fund balances remaining when the Contracts terminate."), ECF No. 1.

In 2008, however, the Plan "commenced an investigation of [its] investments and funding sources," either due to the discrepancy between Prudential's and MetLife's accounts or because of the financial and credit crisis (the parties give different accounts). Pl.'s Summ. J. Br. 32; Def.'s Resp. Summ. J. 18, ECF No. 85. During the course of this investigation, the Plan

---

[2] "The Form 5500 Series is the principal source of information and data concerning the operation, funding, assets and investments of pension, welfare and fringe benefit plans, and also serves as the primary means by which the operation of plans can be monitored by participants, beneficiaries and the general public." Revision of Annual Information Return/Report, 65 Fed. Reg. 5026–01 (Feb. 2, 2000).

learned—allegedly for the first time—that MetLife "had fundamentally changed its approach to apportioning dividends in 1998, as well as the true rationale behind the change." Pl.'s Summ. J. Br. 33. According to McGuire, only then did it become clear that MetLife had changed its dividend policy specifically to foreclose future dividend payments. *See*, *e.g*., Pl.'s Compl. ¶ 46. The Plan also learned that MetLife considered any surplus in its account to be its own asset, not that of the Plan. *Id*. ¶ 70.

MetLife entered into a tolling agreement with the Plan and Union Carbide effective October 19, 2009, until its termination in January 2012. *See* Tolling Agreement 1, *attached as* Def.'s Summ. J. Br. Ex. 40. On February 22, 2012, McGuire filed suit on behalf of the Plan.

**D**

In his complaint, McGuire alleges five distinct counts: (1) MetLife violated its fiduciary duties under ERISA § 406(a) and (b) and engaged in prohibited transactions by changing its dividend policy and determining not to pay dividends under the Contracts in 1999 and subsequent years; (2) MetLife failed to discharge its fiduciary duties under ERISA § 404 "by determining not to pay dividends" and "repudiating its obligation to remit to the Plan the fund balances under the Contracts"; (3) MetLife was unjustly enriched by failing to pay dividends to the Plan and otherwise failing to return fund balances to the Plan; (4) MetLife represented that dividends were unlikely knowing that "its dividend policy change was certain to result in the cessation of dividends for the Plan" (equitable estoppel); and (5) a request for declaratory judgment that "[u]pon termination of the Contracts, the Plan is entitled to receive from MetLife any remaining assets associated with the Contracts." Pl.'s Compl. ¶¶ 91, 101, 111, 112, 118, 125.

MetLife filed a motion to dismiss each of McGuire's claims, but only the equitable estoppel claim (Count IV) was dismissed from the case. *See* Sept. 26, 2012 Order 33, ECF No. 20. On February 21, 2014, both parties filed motions for summary judgment, each asserting that judgment as a matter of law is appropriate on the fiduciary duty claims (although, of course, the parties argue for opposing results). Both parties also filed motions to strike various opinions expressed by the parties' three experts (two for MetLife, one for McGuire).[3]

## II

It is plain from McGuire's complaint that many of his claims rely upon his assertion that MetLife acted as a fiduciary under ERISA. Indeed, the case centers, at least initially, on that very question: Can MetLife be characterized as a fiduciary to the Plan? This question, in turn, requires a determination of whether—under ERISA—MetLife exercises discretionary authority or control in the management of the Plan's assets. So a discussion of the applicable ERISA statutory framework and the Contracts at issue here is necessary.

### A

ERISA provides that a "person is a fiduciary with respect to a plan," and therefore subject to ERISA fiduciary duties, to the extent "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). The Contracts at issue are, at least in part, "guaranteed benefit policies," defined by ERISA as "an insurance policy or

---

[3] In addition, MetLife filed a motion to strike McGuire's reply to its response to his motion for partial summary judgment. *See* Def.'s Mot. Strike, ECF No. 56. MetLife observed that the Court held the parties to the seven-page limitations for reply briefs set by the Local Rules. *See* E.D. Mich. LR 7.1(d)(3)(B). Although McGuire's reply is only six pages, MetLife complains that McGuire "placed a substantial portion of [his] argument into a single-spaced 'Appendix' rather than in the brief itself," and "crammed almost half of its brief into footnotes in tiny single-spaced type in violation of the Local Rules." Def.'s Mot. Strike Br. 1, *attached as* Def.'s Mot. Strike Ex. A. McGuire's brief is less than seven pages, however, and MetLife does not identify any rule prohibiting a party from placing a substantial portion of its argument in footnotes (although, as MetLife adequately demonstrates, such a practice is not to be encouraged). At this point, however, the motion to strike will be denied without further discussion.

contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer." § 1101(b)(2)(B). ERISA does not define what the "assets" of a plan are, but it does provide some guidance for determining whether the assets associated with a guaranteed benefit policy are plan assets:

> In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer.

29 U.S.C. § 1101(b)(2).

In *Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86 (1993), the Supreme Court discussed what it called "[t]he guaranteed benefit policy exclusion" contained in § 1101(b)(2). *Id*. at 96. The Court acknowledged that "[f]iduciary status under ERISA generally attends the management of 'plan assets,'" but finding no definition of "plan assets" in ERISA's statutory framework, the Court endeavored to "determine the bounds of a statutory exclusion from 'plan asset' categorization"—the § 1101(b)(2) exclusion for guaranteed benefit policies. *Id*. at 89.

The Court explained that assets "obtained 'solely' by reason of the issuance of 'an insurance policy or contract' that provides for benefits 'the amount of which is guaranteed'" are not plan assets under the guaranteed benefit policy exclusion. *Id*. The Court made clear, however, that the exclusion "is markedly confined," applying only "to the extent" that the contract actually provides for guaranteed benefits. *Id*. The *Hancock* Court emphasized that "the guaranteed benefit policy exemption is not available to 'any' insurance contract that provides for guaranteed benefits but only 'to the extent that' the contract does so." *Id*. at 97.

Accordingly, when determining whether the guaranteed benefit policy exclusion applies to a specific contract, courts are to divide "the contract into its component parts" for an

- 9 -

"examination of risk allocation in each component." *Id*. at 102; *see also id*. at 104 ("Congress apparently recognized that contracts may provide to *some* extent for something other than guaranteed benefits, and expressly declared the [guaranteed benefit] exemption unavailable to that extent."). "A component fits within the guaranteed benefit policy exclusion only if it allocates investment risk to the insurer." *Id*. at 106.

Because application of the guaranteed benefit exclusion focuses heavily on the specific contract at issue, the Supreme Court dedicated significant effort to describing the contract involved in *Hancock*. Known as GAC 50, the contract was initially "a simple deferred annuity contract," but after many amendments, GAC 50 included a number of features:

> Assets and liabilities under GAC 50 were recorded (for bookkeeping purposes) in two accounts—the "Pension Administration Fund" recorded assets, and the "Liabilities of the Fund," liabilities. GAC 50 assets were not segregated, however; they were part of Hancock's pool of corporate funds, or general account, out of which Hancock pays its costs of operation and satisfies its obligations to policyholders and other creditors. Hancock agreed to allocate to GAC 50's Pension Administration Fund a pro rata portion of the investment gains and losses attributed to Hancock's general account assets, and also guaranteed that the Pension Administration Fund would not fall below its January 1, 1968, level.

> GAC 50 provided for conversion of the Pension Administration Fund into retirement benefits for Sperry employees in this way. Upon request of the Sperry Plan Administrator, Hancock would guarantee full payment of all benefits to which a designated Sperry retiree was entitled; attendant liability would then be recorded by adding an amount, set by Hancock, to the Liabilities of the Fund. In the event that the added liability caused GAC 50's "Minimum Operating Level"—the Liabilities of the Fund plus a contingency cushion of five percent— to exceed the amount accumulated in the Pension Administration Fund, the "active" or "accumulation" phase of the contract would terminate automatically. In that event, Hancock would purchase annuities at rates stated in the contract to cover all benefits previously guaranteed by Hancock under GAC 50, and the contract itself would convert back to a simple deferred annuity contract.

> As GAC 50 was administered, amounts recorded in the Pension Administration Fund were used to provide retirement benefits to Sperry employees in other ways. In this connection, the parties use the term "free funds" to describe the excess in the Pension Administration Fund over the Minimum Operating Level (105

- 10 -

percent of the amount needed to provide guaranteed benefits).  In 1977, Sperry Plan trustee Harris obtained the right to direct Hancock to use the free funds to pay "non-guaranteed benefits" to retirees.  These benefits were provided monthly on a pay-as-you-go basis; they were nonguaranteed in the sense that Hancock was obligated to make payments only out of free funds, *i.e.*, only when the balance in the Pension Administration Fund exceeded the Minimum Operating Level.

*Id*. at 91–92 (internal citations omitted).

The insurer in *Hancock* (Hancock Mutual Life Insurance Company) argued that GAC 50 provided for guaranteed benefits "in its entirety," and accordingly the guaranteed policy exclusion should apply to prevent any related assets from constituting plan assets.  *Id*. at 94.  But the Court rejected the argument and concluded that GAC 50 "fits the statutory exclusion only in part."  *Id*. at 102.  This result followed because GAC 50 provided, for many years, some benefits that were not guaranteed.  *Id*. at 103 (noting that GAC 50 provided for benefits from the "free funds" the amount of which was not "guaranteed by the insurer.").  The Court emphasized the fact that the Pension Administration Fund in *Hancock* was "guaranteed only against a decline below its January 1, 1968, level."  *Id*. at 105.  The Court then concluded that "Harris thus bears a substantial portion of the risk as to fluctuations in the free funds."  *Id*.  Because the risk of investment as to the free funds remained with the plan, and not the insurer, the Court concluded that the guaranteed benefit exclusion did not prevent those assets from constituting plan assets.

## B

While the parties here agree that both Contract 142-J and Contract 314-J are, at least in part, "guaranteed benefit policies," *see* Def.'s Summ. J. Br. 1; Pl.'s Summ. J. Br. 2, they disagree as to whether the Contracts have a non-guaranteed component.  Whether the Contracts contain a non-guaranteed component is important, of course, because if they do not, they are fully guaranteed policies and any related assets cannot be plan assets under the guaranteed benefit policy exclusion.  If the Contracts do contain non-guaranteed components, however, assets

- 11 -

related to those portions of the Contracts may constitute plan assets which impose fiduciary obligations on MetLife.

1

McGuire contends that the Contracts do contain a non-guaranteed component "in the form of a varied investment return"—in other words, "the Contracts provide for dividends when the Contracts' surplus funds, from which dividends would be paid, accumulate."  Pl.'s Summ. J. Br. 36, 37.  According to McGuire, the management of these surplus funds triggers fiduciary obligations on MetLife's part because the funds are plan assets.  McGuire also claims that the Contracts themselves are plan assets (as contemplated by § 1101(b)(2)), and that the discretionary decision concerning whether to pay a dividend pursuant to the Contracts thus constitutes management of plan assets as well.

To substantiate his position, McGuire retained Ethan Kra, an actuary with over 40 years' experience, including "extensive experience in defined benefit plans" like the Contracts at issue. *See* Kra Report 2, *attached as* Def.'s Mot. Exclude Kra Ex. A, ECF No. 78.  Kra has an impressive résumé that includes a bachelor's degree in mathematics—*summa cum laude*—from Yale University, as well as two masters degrees and a Ph.D. in mathematics, also from Yale University. *Id*. at 3.

In order to determine whether the ERISA guaranteed benefit policy exclusion applies here, Kra was asked to analyze the Contracts and determine "whether the Contracts contained any non-guaranteed investment component." *Id*. at 4.  Kra was then asked to assume that MetLife was a fiduciary with respect to the surplus funds contained in its general account in order to address whether MetLife's conduct was consistent with ERISA fiduciary obligations. *Id*. at 4–5.  His final two opinions, also assuming that ERISA applies to the Contracts and the

- 12 -

surplus funds, address whether the Plan's financial reporting of the Contracts was correct, and whether the Plan suffered damages due to MetLife's conduct. *Id*. at 5.

First, Kra concluded that the Contracts do contain a non-guaranteed component. He explained that the Contracts are participating contracts that contain "an experience account, or experience fund, that reflects the contract's share of the experience of the insurer's general account." *Id*. at 8, 12. Because the value of the Contracts' experience account—held in MetLife's general account—will fluctuate with the investment performance of that general account, Kra concluded that "the risk of investment losses due to negative financial events . . . is primarily with the Plan." *Id*. at 15–16.

Kra concluded that "[t]o the extent that the assets in the experience account are needed to make guaranteed benefit payments, they will be used for that purpose; to the extent that the assets in the experience account exceed the amount needed to make such payments, they will accumulate in the Contracts' experience account." *Id*. at 18. He then explained that "[p]ursuant to the Contracts, positive experience is to be paid out in the form of dividends." *Id*.; *see also id*. at 20 ("The expectation of the parties when the Contracts were issued, and the expectation of the contract holder to this date, is that the excess will be paid out to the Plan in the form of dividends.").

Kra recognized that the Contracts have been amended many times, notably in 1973, but he concluded that they remain participating annuities with an identifiable experience account: "The Contracts were not amended to state that the experience account was terminated, rather the Contracts would continue to accrue surplus in a variety of forms. It was a matter-of-fact that the surplus belonged to the Plan, and the 1973 amendments simply provided details on the payout schedule and applicable interest rates." *Id*. at 12–13.

- 13 -

In order to address the second question proposed to him, Kra assumed that the surplus, or "experience account," held in MetLife's general account was "protected by ERISA." *Id*. at 21. He then concluded that MetLife breached its fiduciary obligations by "drastic[ally] chang[ing]" its process for declaring dividends in 1998 and sending a "misleading" disclosure letter that "makes no mention of the dividend policy changes affecting the Contracts." *Id*. at 28, 32, 33.

Third, Kra indicated that "the Plan has consistently reported the full value of the experience account of the Contracts . . . as the Plan's assets on the Plan's Forms 5500 and financial statements." *Id*. at 41. Kra suggested that this treatment "of the Contracts reflects recognition of their participation feature, . . . comports with generally accepted accounting practices, and was completed with the assistance of reputable accounting and auditing firms." *Id*.

Finally, Kra opined that "the Plan's actual damages" from MetLife's conduct "are equal to the participation rights of the Contracts, or the positive investment experience in excess of benefit obligations that should have been returned to the Plan over time, in the form of dividends or as a final payout." *Id*. at 44. In a supplemental report, Kra estimates the Plan's overall damages "to be approximately $30.9 million, based on the positive financial experience of the Contracts, which MetLife improperly appropriated for its own behalf." Kra Supp. Report 2, *attached as* Def.'s Mot. Exclude Kra Ex. B.

**2**

MetLife, by contrast, asserts that neither Contract 142-J nor Contract 314-J contain a non-guaranteed component, and that any related assets are not plan assets by way of the guaranteed benefit policy exclusion. According to MetLife, since 1973 the Contracts have "operated . . . as fully allocated guaranteed benefit policies." Def.'s Summ. J. Br. 1. MetLife

explains that it "immediately applied contributions under 142-J to guarantee specific annuity benefits to specific participants." *Id.* at 8; *see also* 1990 Form 5500 Filing Info. 4, *attached as* Def.'s Summ. J. Br. Ex. 18 ("[142-J] is a Deferred Annuity Contract underwritten jointly by the Prudential and the Metropolitan Life Insurance Co. All assets under the contract have been allocated to provide benefits for active and retired lives."). Similarly, MetLife asserts that in 1973 all unallocated funds controlled under 314-J were transferred to other contracts so that Contract 314-J now consists "only of the annuities on retired lives already purchased thereunder," such that the Contract is fully allocated as well. Def.'s Summ. J. Br. 10 (emphasis and citations omitted).

> During oral argument on June 23, 2014, counsel for MetLife reiterated the point:
>
> [S]ince 1973, the contracts have provided—first of all, since 1973, there have been no contributions under 314-J. All unallocated funds under 314-J were paid out as a result of the 1973 amendment and no new money came in. So 314-J, which is the smaller of the two, becomes essentially irrelevant to that discussion after '73. With respect to 142-J, your Honor, after 1973, *every dollar that comes in from Union Carbide is immediately, immediately converted and applied to the purchase of a guaranteed benefit.*

June 23, 2014 Hr'g Tr. 20 (emphasis added), ECF No. 96; *see also id.* at 30 (MetLife's counsel indicating that all monies contributed by Union Carbide and covered employees were "allocated funds that were committed in their entirety to guaranteed benefits"). MetLife makes the same representation in its brief supporting its motion for summary judgment: "Until 1994, when contributions ceased, each dollar contributed under the Contracts was immediately applied to the purchase of unconditionally guaranteed annuity benefits in a fixed amount, payable on retirement." Def.'s Summ. J. Br. 1.

And just as McGuire did, MetLife retained experts to substantiate its assertions. MetLife's first expert is Ian Altman, a "Fellow of the Society of Actuaries" with 30 years'

experience who has "worked with over 100 retirement plans" to "advise . . . clients on the characteristics and operation of these insurance products."  Altman Report 1, 13, *attached as* Pl.'s Mot. Exclude Altman Ex. 1, ECF No. 75.  Like Kra, Altman has impressive credentials, including a bachelor's degree from Yale University in Math and Economics, and he has testified as an expert in twenty different cases over the past four years.  *Id*. at 25–27.

Altman explained that both Contract 142-J and Contract 314-J are fully-allocated contracts with "a full transfer of risk to [MetLife]" and "all funds credited to secure individual liabilities."  *Id*. at 3, 4.  Altman also opined that the Contracts here "are substantially different than the contract at issue in the [*Hancock*] case[,]" and "Union Carbide's manner of reporting plan assets on Form 5500 and in financial statements do not support the argument that the [Contracts] were plan assets."  *Id*.

With his first opinion—that the Contracts are fully allocated—Altman challenged Kra's distinction between "participating" and "nonparticipating" contracts: "distinguishing between participating and nonparticipating contracts," he said, "is not the key distinction to be noted here, since both allocated and unallocated contracts can be participating contracts."  *Id*. at 8.  Instead, Altman focused on whether the Contracts are fully allocated.  He stressed that MetLife removed from the Contracts all "unallocated funds via the 1973 contract amendments," and "[w]ith the removal of the unallocated assts, [sic] no residual contract holder value remains in the contracts once all benefits are paid."  *Id*. at 12, 13.

Altman also responded to Kra's conclusion that the surplus or "experience account" was a Plan asset to be paid out upon termination: "An experience account *does not consist of unique assets*, it is merely an accounting or notational account."  *Id*. at 14 (emphasis added).  Altman continued, indicating that "[t]he tracking of individual contracts' financial experience is

necessary to determine whether divisible surplus exists and how it will be allocated to specific contracts. It does not imply a right to receive a payout of part of all of the accumulated 'fund balance' or positive experience . . . ." *Id*. Altman declared that "[n]owhere does [142-J] state that the insurance companies are obligated to pay out any amounts upon the termination of the contract." *Id*. at 11. Instead, in Altman's experience, "important provisions like disposition of funds upon termination are governed by specific, express contract provisions." *Id*. at 13–14. Because the Contracts "contain no specific provisions that require payment of 'experience account' funds upon termination," he concluded that MetLife is not required "to pay terminal amounts under either contract." *Id*. at 14.

In addition, Altman was tasked with comparing the Contracts in this case to that in *Hancock*. He concluded that the Contracts are "broadly and substantially different than the [*Hancock*] insurance contract" because the contract in *Hancock* was "an unallocated Immediate Participation Guarantee contract," while the Contracts here are "allocated Deferred Annuity contracts." *Id*. at 16. The Contracts here, Altman opined, are "guaranteed annuity benefits" that MetLife "is contractually obligated to pay to participants and beneficiaries, without recourse to collecting more from the plan sponsor if investment (or other) experience was poor—plain evidence of investment risk residing with the insurer." *Id*. at 17–18.

With the final section of his report, Altman indicated that Union Carbide "appears to have been completing incorrect Form 5500s for years" because "assets under allocated accounts such as 142-J and 314-J are not to be reported as 'unallocated,' " but Union Carbide has been reporting the experience account as a Plan asset. *Id*. at 19. According to Altman, "[w]hatever Union Carbide's intentions in reporting these as unallocated contracts, this incorrect reporting in

no way changes the actual nature of the contracts, which were allocated contracts, as previously explained." *Id*. at 20.

MetLife employed a second expert in this case, Steven Schreiber, an actuarial consultant with more than twenty-five years' experience.   Schreiber Report 1, *attached as* Pl.'s Mot. Exclude Schreiber, ECF No. 73.   Schreiber earned a bachelor's degree in Mathematics from Binghamton University, is a member of numerous professional actuarial organizations, and has published a variety of articles related to the actuarial industry over the past ten years.   *Id*. at 41–42.

Schreiber authored a report in which he addressed "the meaning of 'divisible surplus' as that term is used in the life insurance industry" and "the manner in which insurance companies allocate any divisible surplus."   *Id*. at 2.   Schreiber's report also addressed "certain actions taken by MetLife in 1998 and later years."   *Id*.   He concluded that "MetLife reasonably determined that there was no divisible surplus arising from [the Contracts'] dividend class each year after 1996 . . . and, as such, no dividends have been paid to this dividend class since March 1998."   *Id*. at 6. Schreiber said that "[w]hile MetLife remains obligated to pay the guaranteed benefits under the contracts . . . it would be inappropriate to pay dividends to contractholders when MetLife determined there was no divisible surplus."   *Id*.

Schreiber also responded to Kra's report, concluding that Kra "incorrectly states that because MetLife did not describe dividend policy changes it misled policyholders."   *Id*. According to Schreiber, "dividend formulas used in the apportionment of divisible surplus are

not publicly disclosed by insurance companies, and MetLife had no obligation to disclose or negotiate the details of its dividend practices." *Id.*[4]

### III

Just as they disagree about whether the Contracts contain non-guaranteed components, McGuire and MetLife have vastly different explanations for why MetLife stopped paying dividends. This disagreement is relevant because it drives the analysis concerning the application of various ERISA limitations periods, so the different positions will be briefly outlined.

### A

McGuire contends that the lack of dividends since 1998 stems not from increased mortality rates, but because MetLife intentionally changed its method for determining dividends to ensure it would not have to pay any:

> The stoppage of dividends here had nothing to do with the funding of the Contracts themselves, the performance of the assets underlying the Contracts, or any specific mortality studies or other beneficiary-based actuarial findings whatsoever. It was simply a function of MetLife changing its dividend "method" to group the Contracts with hundreds of other discontinued contracts that were assigned years of negative interest which represent no real expense.

Pl.'s Summ. J. Br. 21 (internal citation omitted). Before 1998, McGuire contends, MetLife "determined dividends based on individual case experience" rather than based on groups of contracts. *Id.* at 18 (citation omitted). According to McGuire, "[s]urplus was calculated at the contract level by comparing each contracts' fund balances to projected benefit obligations, and dividends were apportioned based on a dividend formula that set aside funds for expenses, risk charges, asset fluctuations, and other contingencies." *Id.*

---

[4] Notably, all three experts indicate in their reports what documents they reviewed in formulating their opinions. However, it is not at all clear whether the three experts considered the same information during their review of the case materials.

There is evidence supporting this position.   On September 22, 2008, Bruce Stone—employed by MetLife—sent an email to Jon Abouaf, Rhea Adler, and Zachary Granovetter, other MetLife employees.   In the email, Stone explained how MetLife changed the way it determined dividends in 1998: "Since 1998, MetLife has determined dividends on the experience of the block of par business as a whole . . . .   Prior to 1998 MetLife determined dividends based on individual case experience."   Sept. 22, 2008 Stone E-mail, at 2, *attached as* Pl.'s Summ. J. Br. Ex. 34.   Likewise, during her 30(b)(6) deposition (representing MetLife), Adler acknowledged the same:

> Effective after 1998, we made the decision to look at the experience of the block of participating business which included group-deferred annuities, deposit administration contracts, and paid-up IPG contracts as a block, meaning that if the block of business had negative surplus, we would not declare dividends on any individual contracts.   Prior to 1998, we looked at each case as an individual and determined if a dividend was payable based on a single case's financial experience.

Adler 30(b)(6) Dep. 41; *see also* Studley Memo., *attached as* Pl.'s Summ. J. Br. Ex. 26 (MetLife Vice President and Actuary indicating that "[p]rior to 1998, the Group Pensions Dividend Formula based a contract's dividend on the excess of its fund over its dividend reserve.   Contracts could get dividends even if the entire block was in a loss position because the formula was applied one contract at a time. . . .   In 1998, it was decided that dividends would only be paid if funds exceeded dividend reserves in aggregate.   If dividends were to be paid, they would be allocated only to those groups that actually had a surplus.").

**B**

MetLife, on the other hand, claims that payments stopped because there is a negative balance for the "class" of contracts to which the Contracts belong—resulting in no divisible surplus to divide among the Contracts.[5]

First, MetLife maintains that it did not change its *method* for determining dividends under the Contracts in 1998, only its *formula* for doing so.  It argues that it has always assessed dividends based upon a class of contracts, not individual contracts alone: "MetLife's written policy dating back to at least 1980 has provided that contracts are to be placed into classes and considered together in making dividend determinations."  Def.'s Summ. J. Br. 12; *see also* 1980 Dividends & Surplus Basic Principles, at 3, *attached as* Def.'s Summ. J. Br. Ex. 14 (indicating that as of 1980, dividends are calculated after "contracts are classified for the purpose of apportioning dividends" based on various factors "which reflect the cost of risks insured and the policy provisions.").  Next, MetLife asserts that its dividend calculations for "Contracts 142-J and 314-J"—at least since 1980—have always involved assessing "several hundred group annuity contracts."  Def.'s Summ. J. Br. 12.  During oral argument, counsel for MetLife confirmed as much:

> The clear testimony that we have here, your Honor, is that at all times, [MetLife] treated—[MetLife's] policy was to look at the experience of a class of contracts and looking at the experience—and the class did not consist of two contracts. And I want to just pause right there because this whole idea that it was a class of one or a class of two is just based on a complete misreading of the contract.

June 23, 2014 Hr'g Tr. 27.

---

[5] Further highlighting the factual discrepancy here, although MetLife's 1998 Letter indicated that dividends were unlikely "because of steadily improving mortality over the years," Mar. 11, 1998 Letter, Adler testified during her 30(b)(6) deposition that there was "no specific study done" on the class of contracts to which the Contracts belong "indicating that there had been increased mortality risk associated with the contracts."  Adler 30(b)(6) Dep. 272.  In fact, Adler confirmed that there "was *no* specific study done on that class of business."  *Id.* (emphasis added).

Instead of altering how it grouped contracts together for determining dividends in 1998, MetLife argues that it simply changed its dividend formula. *See id.* at 46 (MetLife counsel indicating that "[t]he dividend formula was changed in 1998."). MetLife's counsel explained the need for this change during the June 23, 2014 Hearing:

> There's been testimony that the reason the dividend formula was changed was because there was a recognition that unlike in the past . . . there was a recognition that the class as a whole was a deficit. There's been testimony that—well, the formula was changed in 1998. The overall policy of looking—of classifying contracts based on similar characteristics and looking at the class as a whole *did not change.*

*Id.* (emphasis added).

There is also evidence in the record that supports MetLife's position. Stanley Talbi, a MetLife employee for many years (currently its Chief Risk Officer), testified at his deposition that the 1998 formula change was "a change in the wording in the formula. *It should not have been a change in the procedure that was used*" to calculate dividends. Talbi Dep. 89 (emphasis added), *attached as* Pl.'s Summ. J. Br. Ex. 14. Stephanie Gordon was also employed by MetLife in 1998, and was a member of its "Financial Strategies unit." Gordon Dep. 27, *attached as* Pl.'s Summ. J. Br. Ex. 15. She testified that prior to 1998, MetLife always "first calculated divisible surplus *as a class of contracts.*" *Id.* at 110 (emphasis added). Only once a divisible surplus was declared did MetLife allocate surplus "to group annuity contracts based on their own individual experience." *Id.*

## IV

As indicated above, the parties have both filed motions for summary judgment—focusing on whether the surplus or "experience account" constitutes a Plan asset imposing fiduciary obligations on MetLife—and motions attacking each of the three experts in the case. Because the parties rely on those experts in making various arguments related to summary judgment, the

- 22 -

Court will first take up the three motions to exclude expert opinions. Then the two motions for summary judgment will be considered.

**A**

Under *Daubert* and its progeny, district courts must exercise a gatekeeping role in screening the reliability of expert testimony to keep "junk science" away from juries. *Thomas v. Novartis Pharmaceutical Corp.*, 443 F. App'x 58, 60 (6th Cir. 2011) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). Consistent with this directive, the Federal Rules of Evidence provide:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 gives district courts "broad discretion to determine whether a putative expert's testimony would be inadmissible junk science or instead would be falling within the 'range where experts might reasonably differ.'" *Thomas*, 443 F. App'x at 60 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)).

For an expert's testimony to be admissible, that expert "must possess a verifiable expertise in the subject matter for which he or she seeks to testify." *Wheeler Peak, LLC v. L.C.I.2, Inc.*, No. 07-1117, 2010 WL 611011, at *2 (D.N.M. Jan. 31, 2010); *see also* Fed. R. Evid. 702. The expert is also "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004).

Notably, it is well-established that "an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *United States v. Gordon*, 493 F. App'x 617, 626–27 (6th Cir. 2012) (citation omitted).  Indeed, the Sixth Circuit has made clear that "[e]xpert testimony on the law is excluded because the trial judge does not need the judgment of witnesses."  *Id*. at 627 (quoting *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984)).

**B**

MetLife filed a motion to exclude portions of Kra's expert report pursuant to *Daubert*.  It argues that Kra's report "is littered with improper legal opinions" that should be excluded because "it is the province of the Court, not [McGuire's] actuary, to determine the law."  Def.'s Mot. Exclude Kra 1.  In addition, Kra's supplemental report "purports to offer a damages estimate[,]" and MetLife argues that McGuire "violated its discovery obligations by failing to produce the documentation underlying Kra's damages calculation along with his supplemental report," and thus the "Court should exclude Kra's damages opinions."  *Id*. at 2.

As to MetLife's first point, it argues that "Kra's proposed testimony on the scope of fiduciary duties under ERISA, the scope and application of DOL regulations, and the proper interpretation of certain ERISA amendments in 1996 should be excluded."  *Id*. at 5.  MetLife suggests these "legal opinions" are impermissible.  *Id*.  For example, MetLife argues that Kra's report "includes Kra's opinions about what the Supreme Court 'held' and 'determined' in [*Hancock*]."  *Id*. at 3.  It then argues that "Kra's opinions about . . . the [*Hancock*] case . . . will not be of assistance to the trier of fact."  *Id*. at 6.

MetLife's decision to attack Kra's opinions because they involve an interpretation of *Hancock* is surprising because MetLife's own expert, Ian Altman, also included a discussion of

*Hancock* in his report, declaring how the Supreme Court "ruled" and (unlike Kra) concluding that the case does not apply here:

> In the [*Hancock*] case, the U.S. Supreme Court ruled that a group annuity contract between an insurer and a trustee of employer's retirement plan did not qualify for ERISA's guaranteed policy exclusion to the extent that "free funds" in excess of those necessary to provide guaranteed benefits were subject to discretionary management of the insurer. . . .  As described above, the *Hancock* contract post-1968 amendment consisted substantially of "free funds" that were held in an unallocated form in the Pension Administration Fund without annuity purchase. By contrast, the Metropolitan contracts post-1973 amendment contained only deferred annuities purchased on individual participants, with no "free funds". Further, the Supreme Court ruled "[a] component fits within the guaranteed benefit policy exclusion only if it allocates investment risk to the insurer.  Such an allocation is present when the insurer provides a genuine guarantee of an aggregate amount of benefits payable to retirement plan participants and their beneficiaries."   Unlike the *Hancock* contract's "free funds", the Metropolitan contracts consist of guaranteed annuity benefits that the insurance company is contractually obligated to pay . . . .

Altman Report 17–18.  So MetLife purports to offer an expert who opines about *Hancock*, explains how the Supreme Court ruled, and then assesses whether the case applies here; the very same type of opinions it finds so objectionable in Kra's report.

MetLife also suggests that "Kra's opinions about . . . DOL regulations will not be of assistance to the trier of fact."  Def.'s Mot. Exclude Kra 6.  But again, the type of opinions MetLife finds impermissible in Kra's report are advanced by its own expert.  Altman also explained how Department of Labor regulations affect the Contracts, indicating that "the IRS and DOL views on Form 5500 reporting supports MetLife's position that the assets under 142-J and 314-J are not plan assets."  Altman Report 19.

At this point, Kra's report will not be excluded.  The only opinions Kra offers that are of particular relevance at this stage of the litigation—relating to the Court's attempt to discern whether summary judgment is appropriate—are those contained in his first set of opinions relating to the Contracts themselves; opinions MetLife raises no objection to.  *See* Kra Report 4,

8, 15–16 (where Kra explains that the Contracts are "participating contracts" that contain a "non-guaranteed investment component," and that the "experience account" left the risk of investment "primarily with the Plan."). Kra's opinions relating to "the scope of fiduciary duties under ERISA, the scope and application of DOL regulations, and the proper interpretation of certain ERISA amendments"—all contained in other portions of his report—will not be considered at this point in time.

Moreover, the Court notes that "the usual concerns" of *Daubert* and the Federal Rules of Evidence—keeping unreliable expert testimony from the jury—"are not present in [a bench trial] setting." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010); *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) ("district courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements of *Kumho Tire Co.* and *Daubert* and deserves to be credited."). As this case will proceed to a bench trial if necessary, the Court is less concerned with excluding expert opinions at this juncture. *See* May 22, 2014 Stipulated Order 2 (parties stipulating "that any claims that proceed to trial in this action shall be tried by the Court, and not by a jury."), ECF No. 63. MetLife's motion to exclude portions of Kra's report will be denied without prejudice.

## C

Like MetLife, McGuire filed motions to exclude MetLife's experts. Those motions will also be denied without prejudice.

McGuire's first motion is to exclude portions of Altman's report. McGuire argues that Altman impermissibly attempts to "interpret the Contracts" and advance "legal conclusion[s] . . . based on his reading of the Contracts . . . ." Pl.'s Mot. Exclude Altman 6. But did not

McGuire's own expert—Kra—evaluate the Contracts and opine that they "would continue to accrue surplus in a variety of forms" and were not "amended to state that the experience account was terminated"?  *See* Kra Report 12.  Kra also concluded that the Contracts "represent[] a complete risk transfer from the purchaser to the insurance company."  *Id*. at 17.  So just as MetLife has done, McGuire attempts to advance opinions with his own expert that he then objects to when offered by his opposition.

None of Altman's opinions will be excluded at this point.  The only opinions Altman offers that will be considered here are his assertions that the contracts are fully allocated and do not require MetLife to pay out any positive experience as dividends.  Certainly McGuire can have no objection to the consideration of these opinions when Kra's opposing viewpoints—that the Contracts are "participating contracts" that contain a "non-guaranteed investment component," and that the "experience account" will be "released" and paid out over time as dividends—will also be considered.

McGuire also objects to the portion of Schreiber's report that "opines about what New York state law requires and that MetLife's actions comport with New York state insurance law."  Pl.'s Mot. Exclude Schreiber 4–5.  McGuire argues that these conclusions are "impermissible legal opinions."  *Id*. at 5.  But McGuire nevertheless advances Kra's opinion as to what ERISA requires and whether MetLife's actions comport with those requirements.  *See* Kra Report 22–39.  Surprisingly, McGuire also objects to Schreiber's conclusion that "the Contracts represent guaranteed benefit policies," Pl.'s Mot. Exclude Schreiber 5, but has no problem advancing Kra's opinion that the Contracts have a non-guaranteed investment component "in addition to a guaranteed benefits component."  Kra Report 5.

Neither party appears to have scrutinized their own experts' opinions applying the same criteria they have used to criticize the opposition's experts. The relevant opinions the actuarial experts have advanced are the type of opinions they are qualified to give: opinions concerning the type of insurance contracts at issue and how those type of contracts typically operate in the insurance industry. Otherwise addressing the admissibility of the parties' various expert reports can wait.

**V**

Both parties have also filed motions for summary judgment. McGuire, moving only for partial summary judgment, argues that MetLife is an ERISA fiduciary because "the surplus funds managed by MetLife in excess of the funds used to pay specified benefits under the Contracts constitute 'plan assets' under *Hancock*." Pl.'s Summ. J. Br. 35. McGuire also argues that "the Contracts are assets of the Plan," and that "MetLife's decisions about the payment of dividends constitute management of the Contracts" such that ERISA fiduciary obligations apply to those decisions, too. *Id.* at 45. With the remainder of McGuire's motion, he argues that MetLife breached its fiduciary obligations.

MetLife's motion seeks summary judgment on all of McGuire's claims. MetLife's primary argument is that it is not a fiduciary to the Plan because "the assets in MetLife's general account" stand behind a "guaranteed benefit contract[]" and thus "are not 'plan assets' under ERISA." Def.'s Summ. J. Br. 17. Alternatively, MetLife argues that summary judgment is appropriate because McGuire's claims are barred by ERISA § 401(c)(5)—29 U.S.C. § 1101(c)(5)—or are untimely under ERISA's three-year statute of limitations (29 U.S.C. § 1113(2)) or the distinct six-year statute of repose (29 U.S.C. § 1113(1)).

But summary judgment—for either party—is not appropriate.  As will be discussed, the record demonstrates numerous genuine issues of material fact that foreclose determining, as a matter of law, whether MetLife is a fiduciary to the Plan.  Moreover, genuine issues of fact relating to whether MetLife committed fraud preclude the Court from dismissing McGuire's claims as untimely or barred by ERISA § 401(c)(5).

### A

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986).  All justifiable inferences from the evidence must be drawn in the non-moving party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### B

In his motion for partial summary judgment, McGuire argues that the surplus contained in MetLife's account is a plan asset imposing fiduciary obligations.  He also claims that the Contracts themselves are plan assets and therefore MetLife's dividend determinations constitute management of plan assets as well.  Each issue will be addressed in turn.

**1**

McGuire first argues that MetLife is an ERISA fiduciary to the Plan because "the surplus funds managed by MetLife in excess of the funds used to pay specified benefits under the Contracts constitute 'plan assets' under *Hancock*." Pl.'s Summ. J. Br. 35. He emphasizes that the guaranteed benefit policy exclusion applies only "to the extent" that a contract provides for guaranteed benefits, and he argues that because the Contracts provide for dividend payments— which are in no way guaranteed—the Contracts "provide for 'something other' than guaranteed payments to Plan participants" and thus any surplus funds are "plan assets." *Id.* at 36–37. Management of these assets, McGuire contends, should be assessed under ERISA's fiduciary standard of care.

Kra, armed with decades of actuarial experience, substantiates McGuire's argument. He concluded that the Contracts do contain a non-guaranteed component: "an experience account, or experience fund, that reflects the contract's share of the experience of the insurer's general account." Kra Report 12. And, because the value of that experience account will fluctuate with the investment performance of MetLife's general account, Kra concluded that "the risk of investment losses due to negative financial events . . . is primarily with the Plan." *Id.* at 15–16. In *Hancock*, the Supreme Court noted that "division of the contract into its component parts and examination of risk allocation in each component" is the method for determining whether the guaranteed benefit policy exclusion applies. 510 U.S. at 102. Thus, at least from Kra and McGuire's viewpoint, MetLife had a fiduciary responsibility as to the management of the surplus funds or "experience account," because the risk of investment as to that asset remained with the Plan.

Not to be outdone, MetLife moved for summary judgment on this same issue: whether the surplus constitutes a plan asset under ERISA.  MetLife claims that all "free funds"—like those the Supreme Court said were "plan assets" in *Hancock*—"were transferred out of the Contracts" pursuant to the 1973 amendments.  Def.'s Summ. J. Br. 19.  According to MetLife, "[a]t all times since 1973" the Contracts have operated as allocated contracts; in other words, "Metlife immediately assumed upon receipt of contributions or premiums fixed dollar obligations to provide the retirement benefit specified in the plan." *Id*. (internal quotation marks, brackets, and citation omitted).

And like McGuire, MetLife is not without evidentiary support.  Altman opined that both 142-J and 314-J are fully-allocated contracts, with "a full transfer of risk to [MetLife]" and "all funds credited to secure individual liabilities."  Altman Report 3, 4.  Under *Hancock*, this analysis would lead to a conclusion that the surplus contained in MetLife's general account, which places investment risk with MetLife (according to Altman, anyway), is not a plan asset.

Given the obvious disagreement between these two experts, and their belief that they have viewed evidentiary support for their positions, the Court is precluded from granting summary judgment concerning whether the surplus funds (or "experience account") constitutes a plan asset imposing fiduciary duties.  Both parties' motions for summary judgment will be denied on this issue.

**2**

Next, McGuire contends that "the Contracts are assets of the Plan," and that "MetLife's decisions about the payment of dividends constitute management of the Contracts" such that ERISA fiduciary obligations apply to those decisions.  Pl.'s Summ. J. Br. 45.  Here, too, the opinions offered by the parties' experts preclude summary judgment.

- 31 -

Kra indicated that "[t]o the extent that the assets in the experience account are needed to make guaranteed benefit payments, they will be used for that purpose; to the extent that the assets in the experience account exceed the amount needed to make such payments, they will accumulate in the Contracts' experience account."   Kra Report 18.   He then opined that "[p]ursuant to the Contracts, positive experience is to be paid out in the form of dividends."  *Id.*; *see also id.* at 20 ("The expectation of the parties when the Contracts were issued, and the expectation of the contract holder to this date, is that the excess will be paid out to the Plan in the form of dividends.").

Altman concluded just the opposite: "An experience account *does not consist of unique assets*, it is merely an accounting or notational account."  Altman Report 14 (emphasis added). Altman goes on, indicating that "[t]he tracking of individual contracts' financial experience is necessary to determine whether divisible surplus exists and how it will be allocated to specific contracts.  It does not imply a right to receive a payout of part or all of the accumulated 'fund balance' or positive experience . . . ."  *Id*.  Altman declares that "[n]owhere does [142-J] state that the insurance companies are obligated to pay out any amounts upon the termination of the contract."  *Id*. at 11.

Schreiber agrees with Altman, concluding that "MetLife reasonably determined that there was no divisible surplus arising from [the Contracts'] dividend class each year after 1996 . . . and, as such, no dividends have been paid to this dividend class since March 1998."  Schreiber Report 6.  Schreiber says that "[w]hile MetLife remains obligated to pay the guaranteed benefits under the contracts . . . it would be inappropriate to pay dividends to contractholders when MetLife determined there was no divisible surplus."  *Id*.  Again, highly qualified experts have

weighed in on both sides of the issue—with less citation to the evidence than the Court would

expect, but nevertheless demonstrating that summary judgment is not warranted.

**3**

McGuire also argues that he is entitled "to summary judgment on [his] claim that MetLife

has been unjustly enriched at the Plan's expense by failing to pay dividends to the Plan based on

the investment experience of the Contracts," because it "transfer[red] and conver[ted] . . . the

Plan's fund balances under the Contracts to itself."  Pl.'s Summ. J. Br. 53.  MetLife contends that

McGuire's unjust enrichment claim fails because his "arguments under the Contracts are legally

and factually unsupported.  The Contracts do not require payment of dividends based on a

contract-specific 'surplus' calculation.  Nor do the Contracts require MetLife to 'remit the fund

balances.'"  Def.'s Summ. J. Br. 34–35.

But as discussed at length above, there is evidence on both sides of this question: Kra

opined, consistent with McGuire's contention, that "[p]ursuant to the Contracts, positive

experience is to be paid out in the form of dividends."  Kra Report 18.  Altman concluded that

"[n]owhere does [142-J] state that the insurance companies are obligated to pay out any amounts

upon the termination of the contract."  Altman Report 11.  Because the Contracts "contain no

specific provisions that require payment of 'experience account' funds upon termination," he

concluded that MetLife is not required "to pay terminal amounts under either contract."  *Id*. at

14.  Likewise, Schreiber said that "[w]hile MetLife remains obligated to pay the guaranteed

benefits under the contracts . . . it would be inappropriate to pay dividends to contractholders

when MetLife determined there was no divisible surplus."  Schreiber Report 6.  Summary

judgment is not appropriate on McGuire's unjust enrichment claim, for either party, because it is

not clear whether the Contracts require that MetLife remit funds to the Plan upon termination

and the experts do not identify any specific mutually understood accounting practice establishing a clear course of performance.

### 4

The remainder of McGuire's motion for partial summary judgment addresses whether MetLife breached the fiduciary obligations that he alleges govern its conduct. Because the Court cannot determine whether MetLife had any fiduciary obligations at this point, however, there is no need to address these arguments. McGuire's motion for partial summary judgment will thus be denied in its entirety.

### C

MetLife's motion for summary judgment seeks judgment as a matter of law on all of McGuire's claims. That motion will also be denied in its entirety.

### 1

MetLife's primary argument is that it is not a fiduciary to the Plan because "the assets in MetLife's general account" stand behind a "guaranteed benefit contract[]" and thus "are not 'plan assets' under ERISA." Def.'s Summ. J. Br. 17. But as explained above, the parties' experts foreclose summary judgment on this point. Kra opined that MetLife was a fiduciary to the Plan—with respect to surplus funds and dividend payments—while Altman and Schreiber said otherwise. MetLife's motion for summary judgment based on the lack of fiduciary obligations will be denied.

### 2

Alternatively, MetLife argues that summary judgment is appropriate because McGuire's claims are barred by ERISA § 401(c)(5) or untimely under ERISA's statute of limitations. MetLife argues these constitute "two independent, additional reasons" that McGuire's claims fail

as a matter of law.  Def.'s Summ. J. Br. 4.  But once again, factual discrepancies prevent summary judgment in MetLife's favor.

MetLife first emphasizes ERISA § 401(c)(5) (29 U.S.C. § 1101(c)(5)), which establishes a safe harbor that protects insurance companies from litigation attempting to hold them liable "on the basis of a claim that the assets of an insurer (other than plan assets held in a separate account) constitute assets of the plan . . . ."  ERISA § 401(c)(5)(B).  According to MetLife, this safe harbor provision precludes insurance companies from being subjected to liability—based on a claim that assets in their general account constitute plan assets—for any "conduct that occurred before July 5, 2001."  Def.'s Summ. J. Br. 34.  Because McGuire alleges that MetLife breached its fiduciary obligations by withholding the dividend policy change in 1998, the exclusion is seemingly applicable here (as McGuire's argument is based, in part, on the surplus held in MetLife's account constituting a plan asset).

Aside from § 405(c)(5), ERISA contains a statute of limitations that provides for three-year and six-year time periods during which a plaintiff may bring suit:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation . . . .

29 U.S.C. § 1113 (ERISA § 413).  "So even though an ERISA plaintiff alleging a breach of fiduciary duty generally has six years in which to file suit, 'this period may be shortened to three years when the victim had actual knowledge of the breach or violation.' "  *Brown v. Owens*

- 35 -

*Corning Inv. Review Comm.*, 622 F.3d 564, 570 (6th Cir. 2010) (quoting *Wright v. Heyne*, 349 F.3d 321, 327 (6th Cir. 2003)).

According to MetLife, either ERISA § 401(c)(5) or ERISA § 413 applies to bar McGuire's claims, which were filed in 2012 (although the tolling agreement went into effect in 2009). Section 401(c)(5) would bar McGuire's claims because he seeks to hold MetLife liable, based on a claim that assets in its general account are plan assets, for conduct that occurred before July 5, 2001. *See* Def.'s Summ. J. Br. 33–34. ERISA § 413 would bar McGuire's claims because they were not filed by 2004—six years after the conduct that allegedly violated ERISA, or within three years of McGuire gaining "actual knowledge" of "the facts underlying [his] claims." Def.'s Summ. J. Br. 36–37.

But ERISA § 413 also provides a fraud or concealment exception that, when applicable, overrides ERISA's statutory limitations periods. ERISA § 413 says that "in the case of fraud or concealment," an action for breach of fiduciary obligations "may be commenced no later than six years after the date of discovery of such breach or violation." ERISA § 413.

In *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542 (6th Cir. 2012), the Sixth Circuit addressed the "fraud or concealment" exception contained in ERISA § 413. There, the parties disagreed as to the scope of the exception:

> U.S. Steel and the Fund contend that the fraud-or-concealment exception applies *only* in situations where the fiduciary has attempted to hide its breach from the injured party, *i.e.*, only where there has been "fraudulent concealment," and not simply where the underlying breach sounds in fraud. Plaintiffs, by contrast, take a literal approach and read the exception to apply exactly when it says so: in cases of fraud *or* concealment, meaning that a six-year period applies to claims of fiduciary fraud even absent later acts of concealment.

*Id.* at 548 (emphasis in original). The *Cataldo* court also noted that "whether a six-year limitations period applies in instances where the claim is based upon fraud and there are no

allegations of separate conduct undertaken by the fiduciary to hide the fraud is an open question in this circuit." *Id*. at 550. The court did not, however, resolve the issue because the plaintiffs in *Cataldo* did not "sufficiently plead fraud . . . ." *Id*. at 551. At this point, the scope of the fraud or concealment exception remains unanswered in the Sixth Circuit. *See Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 748 (6th Cir. 2014).

Although the Sixth Circuit did not decide the scope of the "fraud or concealment" exception in *Cataldo*, it provided some assistance to address the issue. After first noting that some circuits had concluded that the fraud or concealment exception does not apply absent "allegations of separate conduct undertaken by the fiduciary to hide the fraud," the court emphasized that "the Second Circuit has provided *a persuasive contrary interpretation*." *Cataldo*, 676 F.3d at 550 (emphasis added). The court cited with approval *Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001), where the Second Circuit held that the six-year statute of limitations for fraud should be applied to cases in which a fiduciary either "(1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; *or* (2) engaged in acts to hinder the discovery of a breach of fiduciary duty." *Id*. at 190 (emphasis in original). The *Cataldo* court, after citing *Caputo*, "assume[d]" without deciding "that a claim of fiduciary fraud not involving separate acts of concealment is subject to a six-year limitations period that begins to run when the plaintiff discovered or with due diligence should have discovered the fraud." *Cataldo*, 676 F.3d at 551.

Applying this guidance, this Court holds that ERISA § 413's fraud or concealment exception applies if McGuire demonstrates that MetLife "breached its duty by making a knowing . . . omission of a material fact" even absent subsequent acts of concealment.[6]

McGuire argues that MetLife omitted material information when it represented in the March 1998 Letter that future dividends were unlikely "because of steadily improving mortality over the years" but did not mention that the Contracts would be grouped with other contracts for divisible surplus determinations. *See* Mar. 11, 1998 Letter. In addition, McGuire contends that neither he, nor the Plan, learned of MetLife's omission until the spring of 2010, when the Plan discovered "for the first time" that MetLife "had fundamentally changed its approach to apportioning dividends in 1998, as well as the true rationale behind the change." Pl.'s Summ. J. Br. 33. Accordingly, McGuire concludes the Plan was not on "actual or constructive notice" of MetLife's contract grouping change until 2010, within three years of filing suit.

Finally, McGuire emphasizes that the Plan exercised the requisite diligence, "dutifully compl[ying] with ERISA and all applicable regulations" by annually submitting Form 5500 filings, engaging outside auditing firms to review Plan filings, and obtaining IRS approval of the Plan's treatment of the Contracts. Pl.'s Summ. J. Br. 59; *see also* 29 U.S.C. § 1023(a)(3)(A); 29 C.F.R. § 2520.103-1 *et seq*.

MetLife believes that ERISA § 413's fraud or concealment exception does not apply here because the Plan was on notice of the dividend change by 2000 at the latest. Def.'s Summ. J. Br. 40–41; *see also Brown*, 622 F.3d at 574 (allegedly fraudulent acts did not trigger fraud or concealment exception "because the Plaintiffs were already on actual notice of the alleged

---

[6] Accordingly, there is no need to address McGuire's alternative argument that "to the extent it is necessary to sustain the claims here, we respectfully ask that the Court reconsider Plaintiff's argument that every year that MetLife exercised it [sic] discretion as a fiduciary, it committed a new, distinct breach of its ERISA obligations." Pl.'s Summ. J. Br. 59.

wrongdoing").  In support of this contention, MetLife emphasizes a May 2000 letter from Eric Schwartz, a MetLife employee, to Cheryl McMillan, an employee with Prudential.  *See* May 2000 Letter, at 2, *attached as* Def.'s Summ. J. Br. Ex. 31.  In the letter, Mr. Schwartz informed Ms. McMillan that "divisible surplus" for the "class" of contracts to which 142-J and 314-J belong "has been depleted."  *Id*.  He also indicated that future dividends were unlikely because the "financial experience" for "contracts of this type has been deteriorating" due to "steadily improving mortality experience and declining investment returns . . . ."  *Id*.  Mr. Schwartz also indicated that  "whether dividends are declared is determined for this block of business as a whole, and individual contract experience is looked to only if dividends are declared for the block as a whole."  *Id*.

But as with the March 1998 Letter, the 2000 Letter does not indicate that the manner in which the Contracts were grouped, or the applicable formula, had *changed*; only that divisible surplus was based upon a contract class that could have included only the Contracts themselves. Indeed, both 142-J and 314-J include language indicating that divisible surplus determinations under either Contract will take into account MetLife's "experience" under the other, without any mention of hundreds of other contracts.  *See* 142-J, at 22; 314-J, at 1973 Amendment ¶ 4.  So it is possible a reasonable juror (or this Court during a bench trial) could conclude that merely telling the Plan that the class of contracts was "depleted"—without explaining that the class now included the Contracts as well as hundreds of other policies—constitutes a material omission.[7] And although the Contracts also make clear dividends would be determined based on "divisible surplus accruing under contracts of this class," *see* 142-J, at 22, the class of contracts to which

---

[7] Assuming that MetLife changed the way contracts were grouped in 1998, itself subject to a factual dispute (as will be explained).

the Contracts belong is not defined by the agreements themselves, and again could have included only 142-J and 314-J prior to 1998.

The important question of fact here is whether, before 1998, divisible surplus was determined based on a "class" of contracts that included only the two Contracts at issue. MetLife argues that there was no policy change, that the Contracts were always grouped with hundreds of others for divisible surplus determinations. *See* Talbi Dep. 89; Gordon Dep. 27. But McGuire—not without supporting evidence—asserts that a "sea change" occurred in 1998 and that only thereafter were the Contracts considered with others for making divisible surplus determinations. *See* Sept. 22, 2008 Stone E-mail, at 2; Adler 30(b)(6) Dep. 41; Studley Memo.

In summary, there is a question of fact concerning whether MetLife altered how it accounted for the Contracts in determining entitlement to divisible surplus. Because of this factual discrepancy, whether MetLife concealed such a change also constitutes a question of fact; if there was no change to contract grouping, there was nothing for MetLife to conceal. The 1998 and 2000 Letters, however, make no mention of regrouping the Contracts in any fashion for divisible surplus determinations, so if such a change did occur at that time, MetLife did not tell the Plan as much. Accordingly, factual disputes prevent the Court from concluding that McGuire's claims related to dividend calculations are barred as a matter of law, either by ERISA § 401(c)(5) or ERISA § 413.

McGuire also argues that his claims concerning the surplus or "experience account" in MetLife's general account are timely because it was not until 2009, "after the Plan's representatives repeatedly inquired about MetLife's financial information for the Contracts," that MetLife asserted "for the first time" its position that "the assets and liabilities associated with the Contracts belong to MetLife, not the Plan." Pl.'s Compl. ¶ 70. McGuire argues MetLife

concealed this position by supplying financial information year after year that listed the experience account as a positive, net asset. *See* Financial Experience Statements, *attached as* Def.'s Summ. J. Br. Exs. 18–27. MetLife, on the other hand, contends that McGuire knew, by 2000 at the latest, that MetLife did not consider the surplus or "experience account" to be a Plan asset. Def.'s Summ. J. Br. 40–41. For this assertion, MetLife relies on numerous financial statements provided to the Plan that indicated the Contracts are "fully allocated." Def.'s Summ. J. Br. 48. MetLife argues that by reporting that "all" of the assets under the Contracts were allocated, it "disclaimed any notion that assets associated with the Contracts were ERISA plan assets." *Id*. at 49.

Again, unresolved factual issues remain, at least as the case has been developed and presented by the parties. These factual issues preclude the Court from declaring, as a matter of law, exactly when McGuire and the Plan knew—or should have known—of the relevant material omissions (if omissions even occurred; itself another factual issue). Did MetLife alter how it grouped the Contracts for divisible surplus determinations in 1998? Did MetLife fail to disclose this "sea change" to McGuire before 2010? Is MetLife's simple assertion that the Contracts were fully allocated sufficient to demonstrate that the surplus or "experience account" was not a plan asset? The parties have both identified evidentiary support on opposite sides of these questions. The Court simply cannot conclude whether ERISA § 413's fraud or concealment exclusion applies; viewing the evidence in the light most favorable to McGuire, however, it does. Summary judgment will thus not be granted based on MetLife's claims under ERISA § 401(c)(5) or ERISA § 413.

**3**

MetLife also claims it is entitled to summary judgment on McGuire's unjust enrichment claim, as explained above. But, also outlined above, summary judgment on this claim is not warranted because of competing assertions of fact. Because summary judgment will not be granted on this issue either, MetLife's motion for summary judgment will be denied in its entirety.

**V**

The question then becomes: How to proceed? The parties have each located and selected some evidentiary support for their factual assertions and marshaled expert actuarial support for their respective positions.

To assist in resolving the conflicting expert positions, the Court proposes to appoint a neutral actuarial expert with forensic accounting experience to assist in locating the evidence, assessing its relevance, and narrowing (or resolving) the issues. Federal Rule of Evidence 706 provides that "on its own," a court may "order the parties to show cause why expert witnesses should not be appointed," and a court "may ask the parties to submit nominations" or simply "appoint any expert . . . of its own choosing." Fed. R. Evid. 706(a). Courts have recognized that "where [a] district court [is] confronted by . . . an unusually complex case and . . . starkly conflicting expert testimony," appointing a neutral expert under Rule 706 is proper. *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1348 (Fed. Cir. 2009); *see also* 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6302 (1997) (explaining that neutral experts under Rule 706 are appropriate when "[e]xpert testimony . . . concerns complex matters" and "the adversaries present conflicting expert testimony on such matters").

- 42 -

There is no doubt that the factual issues here are complex, along with the exacting principles of law.  Moreover, it is clear the parties' experts differ dramatically on the important questions involved.  McGuire's expert, Kra, opined that the Contracts contain a non-guaranteed component because the experience account left the risk of investment with the Plan.  He also concluded that under the Contracts, that experience account, or any positive experience contained therein, is to be paid out in the form of dividends (or at Contract termination).

MetLife's experts, Altman and Schreiber, came to the opposite conclusions.  Altman opined that the Contracts are fully allocated, contain only guaranteed components, and that MetLife is not required to pay positive experience to the Plan.  Schreiber indicated that MetLife had no duty to pay dividends under the Contracts, and that its determination that there was no divisible surplus was reasonable.

All three of these experts have decades of experience with benefit plans, actuarial calculations, and assessment of investment risk.  Due to the complex nature of the case, and the obviously conflicting views of these experienced actuaries, a neutral expert—who can carefully examine the evidence the experts have relied upon—would be helpful.  Once the parties have analyzed the neutral expert's report, they can reassess their own experts' opinions.

Accordingly, pursuant to Rule 706, the parties will be ordered to show cause why a neutral expert should not be appointed.  The parties' motions to exclude the experts' opinion testimony will be denied without prejudice until such a neutral expert—appointed under Rule 706 at the parties' expense—has sifted through the Contracts, the relevant amendments, and, most importantly, MetLife's actual accounting practices.

There is one additional point concerning the appointment of a neutral expert here.  The Court anticipates appointing a neutral expert with some of the authority of a master under

Federal Rule of Civil Procedure 53, what at least one court has termed an "expert master." *Reed v. Cleveland Bd. of Ed.*, 607 F.2d 737, 745 (6th Cir. 1979). When there are "issues to be decided without a jury"—every issue in this case given the stipulation for a bench trial—a master may be appointed if warranted by "some exceptional condition" or "the need to perform an accounting." Fed. R. Civ. P. 53(a)(1)(B).

While a special master typically has "broad discretion" to "regulate all proceedings" and "take all appropriate measures to perform fairly and efficiently the assigned duty," *see Cintron v. Vaughn*, No. 69-13587, 2007 WL 4225790, at *3 (D. Conn. Nov. 28, 2007); Fed. R. Civ. P. 53(c)(1), the expert master's authority here will be far less expansive. Indeed, the expert master will only be compensated pursuant to Rule 706, and the strictures of that Rule will apply to him or her in full force. The only additional powers the expert master will possess, aside from a typical court-appointed expert, is the authority under Rule 53 to "exercise the appointing court's power to compel" evidence. *See* Fed. R. Civ. P. 53(c)(1)(C).

Indeed, should the parties prove unable to demonstrate why a neutral expert should not be appointed in this case, they will be responsible for providing the Court-appointed expert with various materials to use as resources when forming his or her opinions. These materials will be provided in organized binders that are labeled and tabbed. The binders shall contain the parties' various expert reports, including supplemental reports, and deposition transcripts of the experts' testimony. The binders shall also provide all of the materials, tabulated for clarity, that the parties' own experts relied upon when forming their opinions.

Moreover—making this expert slightly unique—the Court-appointed expert may request in writing with notice to all parties any information or documentation referenced in the

documents provided, which the appropriate party shall provide.[8]  *See*, *e.g.*, *LG Elecs., Inc. v. Q-Lity Computer Inc.*, No. 01-2187, 2007 WL 2904057, at *2 (N.D. Cal. Oct. 1, 2007).  Additional materials shall be made available to the Court-appointed expert by the parties as requested.  The Court-appointed expert may give these materials as much weight and consideration as he or she believes—based on professional judgment—is required.  It is important to stress that "[a]lthough the Court-appointed expert may look to the expert reports from the parties' experts to provide guidance as to what the experts and the parties believe are the key issues to be addressed in this case, it is not the Court-appointed expert's role to critique the parties' experts."  *Id*.  Instead, the Court-appointed expert's opinions are to be his or her own independent opinions.  *Id*.

Of course, because the parties will have an opportunity to show cause why a neutral expert should not be appointed, the Court is satisfied that the notice requirements of Rule 53, requiring a court to "give the parties notice and an opportunity to be heard," will be adequately satisfied.  *See* Fed. R. Civ. P. 53(b)(1).

## VI

Accordingly, it is **ORDERED** that MetLife's motion for summary judgment, ECF No. 45, is **DENIED**.

It is further **ORDERED** that McGuire's motion for partial summary judgment, ECF No. 48, is **DENIED**.

It is further **ORDERED** that MetLife's motion to bar Kra, ECF No. 46, is **DENIED** without prejudice.

---

[8] This is an important power for the expert here because the parties have struggled mightily with the production of documents during discovery.  In fact, after McGuire filed a motion for sanctions concerning MetLife's discovery responses, MetLife "acknowledge[d] and accept[ed] responsibility for a series of technical and human errors in responding to [McGuire's] discovery requests in this case."  *See* Def.'s Resp. to Sanctions 1, ECF No. 36.  To keep the Court-appointed expert from similar difficulties, he or she will have the power to compel the parties to produce the documents the expert feels are necessary to formulate his or her opinions.

It is further **ORDERED** that McGuire's motion to bar Schreiber, ECF No. 49, is **DENIED** without prejudice.

It is further **ORDERED** that McGuire's motion to bar Altman, ECF No. 50, is **DENIED** without prejudice.

It is further **ORDERED** that MetLife's motion to strike McGuire's reply, ECF No. 56, is **DENIED**.

It is further **ORDERED** that the parties are **DIRECTED** to show cause, in writing and pursuant to Federal Rule of Evidence 706 and Federal Rule of Civil Procedure 53, why an expert master should not be appointed in this case. The parties' show cause briefs are due on or before **September 2, 2014**.

Dated: August 8, 2014                         s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 8, 2014.

                       s/Tracy A. Jacobs
                       TRACY A. JACOBS